**K.H., through her next friend and guardian ad litem, Patrick T. MURPHY, Plaintiff–Appellee,**

v.

**Gary T. MORGAN, Guardianship Administrator, Department of Children and Family Services, et al., Defendants–Appellants.**

No. 89–3158.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1990.

Decided Sept. 24, 1990.

Patrick T. Murphy, Jeanette DeGrange, R. Jane Burwell, Susan T. Pierce, Kathleen G. Kennedy, and Mary Burns, Office of the Public Guardian, Chicago, Ill., for plaintiff-appellee.

Jeffrey W. Finke, Office of the Atty. Gen., Chicago, Ill., for defendants-appellants.

Before WOOD, Jr., POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

The defendants in this civil rights damages suit (brought under 42 U.S.C. § 1983) appeal—as is their right, *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)—from an order by the district judge rejecting their defense of immunity. The defendants are the Director of the Illinois Department of Children and Family Services, the Department's guardianship administrator, and two social workers employed by the Department; together they raised the defense of immunity in a motion to dismiss the complaint. This was a permissible way to proceed. If the defense was sustained, the suit would have to be dismissed, because these were the only defendants and damages the only relief that the plaintiff was seeking, the claim for injunctive relief having been abandoned. But this means that the only facts before the judge when he ruled on the defense of immunity were those alleged in the complaint, and we must take them as true, as did he. The defendants have attempted to fog the fac-

tual issues by tendering first to the district judge and now to us the transcript of a juvenile court hearing that casts the facts in a light slightly more favorable to them. But since they did not ask the district judge to make any factual findings we shall ignore the juvenile-court transcript beyond reminding the reader that allegations in a complaint are not proven facts.

The complaint paints an ugly picture of official neglect of human misery. K.H., the plaintiff, is a black girl born in Chicago in 1981. When she was seventeen months old she was discovered to have gonorrhea contracted in vaginal intercourse. The juvenile court of Cook County ordered her removed from the custody of her parents. Pursuant to this order, the Department of Children and Family Services placed her with a foster parent. This was placement number one. Two weeks later the Department transferred her to another foster parent, with whom she remained for four months. At the end of that time she was transferred to a third foster parent, with whom she remained for ten months before being transferred to foster parent number four. She remained for more than a year with that foster parent and then was returned to her natural parents. Three months after that, however, she was again removed from her parents' custody on grounds of parental neglect and placed with her sixth parental custodian (counting her parents as the fifth). She was now three years old. Shortly after this transfer K.H. was shifted to yet another foster parent—who beat her; in addition, a neighbor of this foster parent abused K.H. sexually. The hospital staff that discovered this outrage advised the Department that K.H. needed psychotherapy, but none was administered and instead she was shunted to another foster parent, who, far from having the training or ability to care for what had become an emotionally disturbed child, abused her physically. After this abuse came to light, K.H. was transferred to an institution that provides safe and professional care. But that care is expensive. The complaint seeks $300,000 in damages to help defray the psychiatric treatment needed to alleviate the consequences of the defendants' irresponsible discharge of their duty to provide foster care for K.H. We do not know whether, if the suit fails, there is any source of public or private funds for defraying these expenses.

In 1987, when at last K.H. was placed in an adequate facility, she was not yet six years old. She had changed homes nine times in four years. The defendants argue from the juvenile court transcript that there were good reasons for each of the moves and—inconsistently—that none of K.H.'s foster parents abused her. As confession and avoidance, this argument leaves more to be desired than consistency. To change an infant's parents nine times in four years not only is suggestive of profound disarray in the state's system of caring for abused and neglected children; more to the point, it may—though this depends on the state of mind with which the authors of this shuttle, the defendants, acted—bespeak violations by these state actors of their constitutional obligations.

One of the less controversial aspects of the due process clause is its implicit prohibition against a public officer's intentionally killing a person, or seriously impairing the person's health, without any justification. The right to be free from this kind of governmental oppression, although not from lesser oppressions such as defamation and simple assault, is among the "negative liberties" that the due process clause of the Bill of Rights and the Fourteenth Amendment has been held to protect. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982); *DeShaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298, 301 (7th Cir. 1987), aff'd, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir.1983). The extension to the case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified state action is straightforward.

■ This is not a "positive liberties" case, like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other

private persons not acting under the direction of the state. The Supreme Court agreed with this court that there is no such entitlement. Here, in contrast, the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), or the due process clause if he was awaiting trial. *Hamm v. DeKalb County*, 774 F.2d 1567, 1572–74 (11th Cir.1985), and cases cited there. In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions. *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982); *DeShaney v. Winnebago County Dept. of Social Services, supra,* 812 F.2d at 303; *Walker v. Rowe,* 791 F.2d 507, 511 (7th Cir.1986). Consistent with this distinction, *Milburn v. Anne Arundel County Dept. of Social Services,* 871 F.2d 474, 476 (4th Cir.1989), emphasizes the state's lack of responsibility for a child's *voluntary* placement by the natural parents in an abusing private foster home.

■ The Roman analogy is sound even if one concedes, as one must in the light of *DeShaney,* that the State of Illinois has no constitutional obligation to protect children from physical or sexual abuse by their parents. The state could have left K.H. to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety. If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved. The Illinois Department of Children and Family Services could not have subjected K.H. to sexual abuse and then defended on the ground that by doing this it did not make her any worse off than she would have been had she been left with her parents. The law does not ask a prisoner complaining of unsafe and unsanitary prison conditions to prove that he is worse off than he would be if restored to the criminal milieu from which he had been taken off to prison. Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free. The distinction follows the lines of tort law. There is no duty to rescue a bystander in distress, *Yania v. Bigan,* 397 Pa. 316, 155 A.2d 343 (1959); *Jackson v. City of Joliet,* 715 F.2d 1200, 1202 (7th Cir.1983), but having rescued him from certain death you are not privileged to kill him. This is not to say that you assume responsibility for his future welfare. You do not. Our point is only that the absence of a duty to rescue does not entitle a rescuer to harm the person whom he has rescued.

The complaint in this case focuses on the penultimate placement—the placement of K.H. in 1986 with a foster parent who was incompetent to care for an emotionally disturbed child and who physically abused K.H. into the bargain. The complaint alleges that the two caseworkers who are defendants knew that the foster parent was incompetent and that the administrator defendants, although they did not know about K.H.'s case specifically, knew that mindless shuttling of the Department's wards among incompetent foster parents was rampant, and indeed had, without justification, formulated and approved the departmental policies that caused such shuttling to occur. It could be argued, consistent with the previous suggestion to compare a plaintiff's current condition with the

condition he would have been in had the state not intervened, that the *real* injurers in this case are the natural parents, who by their initial abuse of K.H. doomed her to wander among foster homes. No doubt they are joint tortfeasors with the defendants, but this does not excuse the defendants. If, as the complaint alleges, the defendants must have known they were placing K.H. in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present.

Although some or perhaps even all of the defendants may have violated K.H.'s constitutional rights, they can be made to pay damages only if the specific right they violated was clearly established at the time they violated it. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is not enough that the recognition of the right could be predicted from cases dealing with analogous issues, or that the right lay in the line of natural evolution from accepted principles, or that, stated with sufficient generality, the right could be said to exist already. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Landstrom v. Illinois Department of Children & Family Services,* 892 F.2d 670, 677 (7th Cir.1990); *Colaizzi v. Walker,* 812 F.2d 304, 307–08 (7th Cir.1987). In this case, therefore, the specific right asserted—not a right to due process of law but a right not to be placed with and shuffled among foster parents known to be incompetent and indeed dangerous—would have to have been either expressly established by, or clearly implicit in, existing case law, to allow a damages suit to be maintained.

The defense of public officer immunity in civil rights damages suits is thought in some quarters a second-best solution to the problems created by imposing tort liability on public officers. The defense is not found in the civil rights statutes themselves, but is a judicial addition to the statutes, *Malley v. Briggs,* 475 U.S. 335, 339–40, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986)—a creative graft, and viable therefore only if it serves a social purpose. *Id.* at 340, 106 S.Ct. at 1095; *Anderson v.*

*Creighton, supra,* 483 U.S. at 645, 107 S.Ct. at 3041. The defense has been thought necessary to prevent undue timidity by government employees—faced with enormous personal liabilities if they overstep the bounds of their authority (bounds that may have not been apparent when they acted) and someone is hurt, but denied, by methods of compensating civil servants that may be entailed by the very concept of a civil service, commensurate rewards when their vigor and initiative yield net social benefits. The justification becomes strained, however, when, as is increasingly common, the governmental entity indemnifies its employees for damages and other expenses that they incur in defending against suits that complain about their performance of official duties. The indemnity is not always complete, and some governmental entities provide no indemnity, the federal government being a prominent example. But if the public employer itself, by refusing to indemnify its employees for torts committed in the course of public employment—or the legislature, by refusing to authorize indemnity, out of concern with the public fisc—manifests indifference to the disincentive effects of tort liability, it may be questioned whether the courts should worry about those effects and seek to offset them.

An alternative that is sometimes discussed would be to abolish public officer immunity but couple abolition with the imposition of respondeat superior liability on the public officer's employer. Although rejected in *Monell v. New York Dept. of Social Services,* 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978), it would be a step no bolder than the creation, and in recent years amplification, of public officer immunity itself. The officer would be liable but so would be his employer; as a practical matter the officer would be even farther off the hook than under existing law plus the practice of indemnity; but this end would be accomplished without denying a recovery to the plaintiff and thereby diluting the deterrent effect of the civil rights laws. Only as a theoretical matter would the employee be worse off

because an employer held liable for an employee's torts under the doctrine of respondeat superior is entitled to indemnity from the employee. Practice is more important than theory. For helpful background see Kramer & Sykes, *Municipal Liability Under § 1983: A Legal and Economic Analysis,* 1987 S.Ct.Rev. 249.

Such far-reaching proposals, however, are for Congress or the Supreme Court, not for us. Our job is the humbler one of applying the immunity doctrine. We begin with the elementary proposition that it would be improper to deny immunity to a particular defendant on the ground that his conduct could be subsumed under some principle of liability in force when he acted. That approach would shrink immunity to trivial dimensions, since it is always possible to find a principle of comprehensive generality (such as "due process of law"). But the immunity doctrine as it has evolved goes much further than this to protect public officers. It is not enough, to justify denying immunity, that liability in a particular constellation of facts could have been, or even that it was, predicted from existing rules and decisions, even though law, as Holmes famously remarked, is a prediction of what courts will do faced with a particular set of facts. (Maybe it is more than that, but it is at least that.) Liability in that particular set must have been established at the time the defendant acted. It begins to seem as if to survive a motion to dismiss a suit on grounds of immunity the plaintiff must be able to point to a previous case that differs only trivially from his case. But this cannot be right. The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*Youngberg v. Romeo* made clear, years before the defendants in this case placed K.H. with an abusing foster parent in 1986, that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deterio-

rating physically or psychologically. We had anticipated this ruling in *Nelson v. Heyne,* 491 F.2d 352, 360 (7th Cir.1974). No case authoritative within this circuit, however, had held that the state had a comparable obligation to protect children from their own parents, and we now know that the obligation does not exist in constitutional law (*DeShaney*). Ours is the intermediate case in which the state places the child in a private foster home or sequence of such homes and fails to take steps to prevent the child from deteriorating physically or psychologically as a result of either mistreatment by one or more sets of foster parents or the frequency with which the child is moved about within the foster-home system or, as in this case, both.

The intermediate case is really several cases. In one, the supply of competent foster parents is adequate and the defendants have the time and the resources to find a competent foster parent but through indifference to the child's welfare fail to do so, and the foster parent they do place him with—a foster parent whom they know to be dangerous and incompetent—indeed abuses the child. In another case, the supply of competent foster parents is, through no fault of the defendants, inadequate, and they take a well-meaning, calculated risk, which turns out badly, in placing the child with a foster parent of dubious competence or character. Other cases can be imagined but for present purposes the important point is that the first case we described is not truly an intermediate case; it is obviously and inescapably implicit in *Youngberg.* It should have been obvious from the day *Youngberg* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons, *Meador v. Cabinet for Human Resources,* 902 F.2d 474 (6th Cir.1990); *Lipscomb v. Simmons,* 884 F.2d 1242, 1247 (9th Cir.1989), vacated and rehearing en banc granted, 907 F.2d 114 (1990); *Taylor v. Ledbetter,* 818 F.2d 791, 797 (11th Cir.1987) (en banc); *B.H. v. Johnson,* 715 F.Supp. 1387, 1396 (N.D.Ill.

1989), any more than a state could avoid its duty not to impose cruel and unusual punishments by turning over the management of its prisons to private correctional entrepreneurs known to inflict cruel and unusual punishments. *Spencer v. Lee*, 864 F.2d 1376, 1378–79 (7th Cir.1989) (en banc). So the Second Circuit had held in a case materially identical to this case, decided five years before the conduct alleged to give rise to liability in this case. *Doe v. New York City Dept. of Social Services*, 649 F.2d 134, 141–42 (2d Cir.1981). We approved the holding of that case in *DeShaney*. 812 F.2d at 303.

■ We are not suggesting that foster care is a device by which states seek to shirk the responsibility they have assumed for the care of neglected and abused children. Many students of child development believe that foster care is better for children than institutionalization. It is true that, given the privacies of the home, it is more difficult for the state to prevent neglect and abuse by foster parents than by employees in a state institution; nor are foster parents as likely as biological or even adoptive parents to be deterred from sexual abuse by the incest taboo. But institutionalization (public or private) has its own problems. The picture is decidedly mixed, but it can hardly be thought—and it is not argued—that the Constitution requires a state to adopt one system rather than the other. That, however, is not the issue, either of substantive right or of immunity. The substantive issue is whether the state can escape the duties that *Youngberg* imposes on public child-care institutions by deliberately and without justification placing children with foster parents having a known propensity to neglect or abuse children. (We say "known," meaning known to the defendants, because merely negligent, *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), or even grossly negligent, *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th Cir.1988) (en banc), misconduct by state officers is not actionable under section 1983.) The immunity issue is whether this right can be said, on the basis of *Youngberg* and *Doe*, to have been clearly established in 1986. It can be. *Youngberg* made the basic duty of the state to children in state custody clear, and *Doe* added the obvious corollary that the duty could not be avoided by substituting private for public custodians. No case held the contrary and there was no reason to think that *Doe* would not be followed in this circuit.

We emphasize that the issue is not whether the state's duty follows the child into the private home in which he is placed. We may assume, without having to decide, that it does not, that the foster parents, even if paid by the state, are not state agents for constitutional purposes. Certainly if the state decides to return a child whom it has taken custody of to the child's natural parents, those parents do not become state agents. That would undo *DeShaney*. A state court had awarded custody of the plaintiff in that case to his father when his parents were divorced; that did not make the father a state agent whose beating of his child imposed liability on the state. The only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser*. Only in this case thus narrowly described can the foster parent be fairly considered an instrument of the state for child abuse.

In resisting this conclusion the defendants cite our decision in *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir.1989), describing it as holding on similar facts that no such right as we have described had been clearly established in 1984. *Bobbitt*, however, distinguished the Second Circuit's decision in *Doe v. New York City Dept. of Social Services* on the ground that there the child had been placed in a licensed foster home, rather than, as in *Bobbitt*, with a relative. This may seem to be cutting things too fine; our opinion in *DeShaney* states *Doe*-'s holding more broadly. 812 F.2d at 303. But there is indeed a difference between placing a child with a member of her family and placing the child with a foster parent. It is notable in this connection that K.H. does not focus on the return to her parents

as a placement for which she seeks damages. The focus is on her placement with a nonrelative foster parent in 1986. State employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association, *Lossman v. Pekarske*, 707 F.2d 288 (7th Cir.1983), and we do not want to place child welfare workers on a razor's edge—damned if they return the child to its family and damned if they retain custody of the child or place him in a foster home or institution. The aunt who was awarded custody of the plaintiff in *Doe v. Bobbitt* was not a foster parent, and this may explain why *Bobbitt* does not discuss *Youngberg*—and certainly *Bobbitt* does not say that *Youngberg* is applicable only to institutions. *Bobbitt* is distinguishable from the present case, in which the defense of immunity must be rejected—at least upon the present and incomplete record, and at least with respect to the exceedingly narrow formulation of the right to safe foster care that we have sketched.

■ Insofar as the complaint in this case can be read to go further and challenge a *general practice* of shuttling children among foster parents, the defendants are, we believe, immune from damages liability. This is not to deny the seriousness of such a challenge, but to affirm its novelty. It is true that even if all eight sets of parents among whom K.H. bounced had been loving and competent, a child who had so many parents in four years might well suffer psychiatric harm; but if all those parents had been loving and competent, the state would not have shuttled K.H. among them, unless some ghastly plague or war or other catastrophe had killed them off in rapid succession. The reasons for the shuttle are not entirely clear from the incomplete record but cannot be assumed to be frivolous. Apparently one foster parent did die; another left town; some of course were unfit (as were K.H.'s natural parents); others may simply have had short-term contracts with the Department. The wrong lies not in the shuttle itself—the shuttle might be necessary to protect the defendants from liability for placing or leaving a child with a foster parent having a known propensity for child abuse—but in a system of foster care that is unable to achieve a reasonable balance among safety, competence, and stability. Whether the federal courts can solve the underlying problem or even treat the symptoms effectively may be doubted. Although *Youngberg* establishes an intelligible standard of liability (conformity to minimal professional standards—much as in criminal cases in which the defendant argues that his counsel was ineffective), the underlying problem is not lack of professional competence but lack of resources, a problem of political will unlikely to be soluble by judicial means. Good foster parents are difficult to find, unless they are paid generously; good institutional care is expensive too. The needs of neglected, abused, and abandoned children compete with other demands, both public and private, for scarce resources. The allocation of the nation's— even of a single state's—resources is not a realistic assignment for the federal courts. Any standard of foster care that the courts declare in the name of the Constitution is likely to be a minimum one that will do little for the plight of the unwanted, abandoned, neglected, or abused child. But in any event the outer bounds of judicial competence to remedy deep-seated problems of public responsibility are to be explored not in damages suits but in equity actions—a route that K.H.'s guardian rather ostentatiously forwent in this case.

There was no clearly established right to a stable foster-home environment in 1986 (one circuit, indeed, had rejected the right: *Drummond v. Fulton County Dept. of Family & Children's Services*, 563 F.2d 1200, 1208 (5th Cir.1977)); there is none today. There is, made explicit by this opinion but clearly implicit in *Youngberg*, a prima facie right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child. We say "prima facie" to underscore the limitations of this right. *Youngberg* implies that if, because of resource constraints, the defendants cannot find a safe placement for the child, they cannot be held liable in damages

for a risky placement; they have no choice. 457 U.S. at 323, 102 S.Ct. at 2462. The officials responsible for the inadequacy of those resources might be liable in damages, provided they were sued in their personal rather than official capacities, *Will v. Michigan Dept. of State Police,* — U.S. ——, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), and that the plaintiff could surmount the immunity barrier; and there might of course be broader liability in an injunctive suit against those officials. But these are not issues in this case.

Even when resources are not severely limited, child welfare workers and their supervisors have a secure haven from liability when they exercise a bona fide professional judgment as to where to place children in their custody. Only if without justification based either on financial constraints or on considerations of professional judgment they place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages. This right we regard as clearly established, but the distinct right not to be shifted among foster homes "too frequently" remains more problematic and its existence and dimensions remain to be explored in proceedings suitable to the elaboration of constitutional rights. The Supreme Court believes that damages suits are not suitable for this purpose. The case must therefore be remanded to enable the district judge to determine how much of the complaint survives our analysis of immunity.

■ We reject the defendants' alternative contention that they are entitled to *absolute* immunity from damages liability. So far as relevant to this case, absolute immunity has been confined to participants in judicial or judicial-type proceedings, such as judges, witnesses, and prosecutors. We may assume that a caseworker who initiates a proceeding to remove a child from its parents' custody, or who executes an order made by a judge in a juvenile proceeding, enjoys absolute immunity. *Babcock v. Tyler,* 884 F.2d 497 (9th Cir.1989).

This is not such a case—there was a juvenile court proceeding, but the defendants have not pointed to any court orders commanding them to place K.H. with particular foster parents—and the suggestion that caseworkers should enjoy absolute immunity merely because they are quite likely to be sued does not distinguish them from police officers or other public officers whose duties require them to interfere with people's liberty or property and hence make them natural targets of civil rights suits.

The defendants present additional grounds for affirming the district court's dismissal of the suit; the plaintiff counters by arguing that those grounds are not proper pendants to an appeal from a denial of immunity. We need not decide the interesting question of the scope of pendent appellate jurisdiction in immunity appeals. *Dube v. State University of New York,* 900 F.2d 587 (2d Cir.1990); see generally *Asset Allocation & Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 568–69 (7th Cir.1989). Such jurisdiction, like its more familiar district court counterpart, is discretionary, *United States v. Gerena,* 869 F.2d 82, 84 (2d Cir.1989), and discretion should be exercised to prevent this judge-made jurisdictional doctrine from swallowing the rule against piecemeal appeals. We therefore decline to exercise such discretion as we may have to consider the defendants' nonimmunity grounds for dismissal at this early stage in the case.

AFFIRMED IN PART, AND IN PART REMANDED WITH DIRECTIONS.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's conclusion that the defendants, who are sued in their individual capacities, are not entitled to qualified immunity from K.H.'s entire cause of action. However, I would hold that significantly more of the complaint would survive the state actors' assertion of their qualified immunity defense than would the majority. I would hold that when state representatives, acting pursuant to a court order based on recommenda-

tions allegedly rooted in the professional judgment of social workers employed by a governmental agency, accept the responsibility of acting in the place of an infant child's natural parents, they are obligated to exercise reasonable professional judgment in the placement, care and supervision of that child.

I turn to the question of whether qualified immunity insulates Illinois state representatives from this damage action for failure to provide proper and necessary care. This case presents allegations that the state agents violated the constitutional rights of a child in state custody through their failure to exercise a reasonable degree of professional competency in the placement of the child while ensuring the child's safety and care. "Under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982), government officials are subject to damages liability only if their conduct has violated 'clearly established' constitutional rights of which a reasonable person would have known." *Wade v. Hegner*, 804 F.2d 67, 69 (7th Cir.1986). Therefore, "[t]he general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [t]o anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). "Thus, ... a qualified immunity analysis entails a purely objective inquiry to determine whether at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented." *Polenz v. Parrott*, 883 F.2d 551, 554 (7th Cir.1989). In *Wade*, 804 F.2d at 70, we held that qualified immunity cases under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), require "a two-part analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" An application of the relevant case law to the facts of this case supports an affirmative answer to both these questions.

The foundation of the state's duty to provide reasonable care for foster children entrusted to its care and custody can be found in a decision of this court some 16 years ago in *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir.1974). There we held that juveniles taken from their parents' custody and placed in a state training school must be given appropriate individualized care and treatment. We stated:

"In our view the 'right to treatment' includes the right to minimum acceptable standards of care and treatment for juveniles and the right to *individualized care and treatment.* Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state *assumes the place of the juvenile's parents, it assumes as well the parental duties, and its treatment of juveniles should, so far as can be reasonably required, be what proper parental care would provide.*"

*Nelson*, 491 F.2d at 360 (emphasis in original and supplied).

In *Nelson* we made clear that it was not the institutional setting but the state's assumption of "the place of the juvenile's parents" that led to responsibility for "parental duties." *Nelson*, 491 F.2d at 360. A state's responsibility for the proper exercise of parental duties toward an infant child in its custody is based on the legal proposition that a child separated from its parents by court order and placed in the custody of the state becomes wholly dependent on the state; thus, the responsibility for proper care exists whether the state places the child in an institution or in foster care.

In the 1970s and the early 1980s, the United States Supreme Court clarified the government's duty to care for those who were completely dependent upon it. In *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976), the Supreme Court determined that the Eighth Amendment provided a right to adequate medical care for adult offenders confined in a state prison. The Court stated:

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. *An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.*" *Estelle*, 429 U.S. at 103–04, 97 S.Ct. at 290 (emphasis added, citation and footnote omitted). As in our decision in *Nelson*, the Supreme Court held that prisoners confined in a penal institution have a right to adequate medical care as their living status in confinement has made them totally dependent upon the state to meet this basic need. Although it was the institutional setting that occasioned this total dependence, it was the dependence resulting from the confinement that gave rise to the prisoners' right to adequate care which they were unable to secure for themselves. An *infant* foster child of tender years (two and one-half years), whom the state removes from her parents' custody, likewise is unable to care for herself and is certainly equally dependent upon the state for the fulfillment of her needs for proper development, food, clothing, shelter and proper medical care as is the institutionalized prisoner.

The prisoner in *Estelle*, among other medical problems, objected to the lack of proper treatment and diagnosis of his back problems. The infant child K.H.'s claims certainly are of a more serious nature. Her sufferings began even before the state took custody of her at age seventeen months, when she became infected with gonorrhea while in her parents' care. Shortly thereafter, the court removed K.H. from her parents and placed her in the custody of the state. While in the state's custody, she was shuttled from one foster parent to another (nine times in three and a half years). Later she was beaten by a foster parent and once more sexually abused by a person other than the foster parent. Still later, while under court-mandated state supervision, she underwent a second instance of physical abuse from another foster parent. Were she an imprisoned criminal, the state's lack of attention to her medical and psychological needs

while in the state's custody might well be classified "cruel and unusual punishment." The Second Circuit in *Doe v. New York City Department of Social Services*, 709 F.2d 782, 790 (2d Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), noted that the state might have even greater accountability for its actions toward foster children than toward prisoners because, as the Supreme Court has noted, those who have not been convicted of a crime are " 'entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.' " *Doe*, 709 F.2d at 790 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321–22, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)).

The most significant applicable Supreme Court case is the Court's decision of some eight years ago in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). As the majority recognizes: "*Youngberg v. Romeo* made clear, years before the defendants in this case placed K.H. with an abusing foster parent in 1986, that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically." Majority at 851. In *Youngberg* the Court initially accepted the state's concession that individuals committed to an institution for the mentally retarded enjoyed constitutionally protected liberty interests in "food, shelter, clothing, and medical care," and also concluded that these individuals possessed a due process right to freedom from unsafe conditions. *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2457–58. The Court further held that constitutionally protected "liberty interests require the State to provide minimally adequate or reasonable training to ensure safety...." *Id.* at 319, 102 S.Ct. at 2459. In reaching this conclusion, the Court stated:

"In addressing the asserted right to training, we start from established principles. As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. See *Harris v. McRae*, 448 U.S.

297, 318, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980) (publicly funded abortions); *Maher v. Roe,* 432 U.S. 464, 469, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977) (medical treatment). *When a person is institutionalized—and wholly dependent on the State—it is conceded by petitioners that a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities.* See *Richardson v. Belcher,* 404 U.S. 78, 83–84, 92 S.Ct. 254, 258–59, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). Nor must a State 'choose between attacking every aspect of a problem or not attacking the problem at all.' *Id.,* at 486–87, 90 S.Ct., at 1162–1163."

*Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458 (emphasis added). *Youngberg,* like *Estelle,* grounded its holding upon the rationale that the involved individuals were "wholly dependent on the State,"[1] because of their confinement. As the Eleventh Circuit noted in a case involving a foster child in the custody of state representatives:

"The liberty interest in this case is analogous to the liberty interest in *Youngberg.* In both cases, the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements. In *Youngberg* the Court said, 'if it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.' *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458, 73 L.Ed.2d at 37.

A child confined to a state mental health facility has a fourteenth amendment substantive due process liberty interest in reasonably safe living conditions. *Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28, 39 (1982). Similarly, if foster parents

with whom the state places a child injure the child, and that injury results from state action or inaction, a balancing of interests may show a deprivation of liberty.

State action was clearly involved in *Youngberg* where the person was confined to a state mental facility. In this case, the child's physical safety was a primary objective in placing the child in the foster home. The state's action in assuming the responsibility of finding and keeping the child in a safe environment placed an obligation on the state to ensure the continuing safety of that environment. The state's failure to meet that obligation, as evidenced by the child's injuries, in the absence of overriding societal interests, constituted a deprivation of liberty under the fourteenth amendment."

*Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 795 (11th Cir.1987) (en banc).

The parallel between the dependence of an infant in state-licensed foster care status and the institutionalized patient or incarcerated inmate likewise has also been recognized in later decisions. In *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989), the Supreme Court stated in a footnote that where the state places a child *"in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect."* 109 S.Ct. at 1006 n. 9 (emphasis added). But the Court did not expressly rule upon the validity of the analogy, since *DeShaney* dealt with the alleged failure of the state to protect a child from the abuse inflicted by his natural parent in his home. In this case the Court found no affirmative duty under the fourteenth amendment for the governmental actor to provide protection in a family setting. In our earlier *DeShaney* opinion we reached a similar conclusion, also implicitly approving the holding in *Doe v. New York City Dept. of Social Services,*

---

1. *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458.

649 F.2d 134 (2d Cir.1981), that the affirmative duty of care set forth in *Estelle* applied to a child in state custody, when the state places the child in a foster home. *See DeShaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298, 303 (7th Cir. 1987). ("Had Joshua been a foundling in the custody of the state, which then placed him with foster parents who it knew or strongly suspected would abuse the child, this case would be like *Doe v. New York City Dept. of Social Services, supra*, 649 F.2d at 138–40, 142"). *See also* Majority at 852 ("We approved the holding of that case [*Doe*] in *DeShaney*"). In view of the Supreme Court's assertive observation in *DeShaney* that the state's custody of a foster child could be a foundation for imposing a constitutional obligation of care and protection, I am of the opinion that the Supreme Court has indicated that when the state accepts custody of an infant child it assumes the responsibility of proper care for the infant's needs. Answering the question the Supreme Court did not expressly resolve in *DeShaney*, I believe that the state's ongoing role as K.H.'s custodian and/or guardian, that commenced when K.H. was removed from her natural parents' home, pursuant to court order, provides a sound legal basis for recognizing a responsibility upon the state to ensure K.H.'s protection and freedom from physical or psychological abuse and to provide for her adequate care.[2] As we recognized in *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir.1988) (en banc): "If the state hauls away a child's parent and thereby exposes the child to danger, it will have to protect the child from the incremental risk." *Cf. DeShaney*, 109 S.Ct. at 1005–06 ("[W]hen the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state actions set by the Eighth Amendment and the Due Process Clause."). Likewise, there is a recognition in our cases that when the state cuts off alternative sources of care through confinement or otherwise there is a clearly established duty to provide appropriate care. This occurs when the state confines a prisoner (*Estelle*) or institutionalizes a mentally retarded person (*Youngberg*), rendering them unable to choose the nature of care for themselves. This also results when an infant child is removed from her parents' care through court order and is placed in the custody and control of a governmental agency. Very recently this court was faced with such a case involving a government decision to cut off other sources of rescue, including private individuals and employees of another governmental entity, thus necessitating dependence on county government for rescue services, and the court observed:

"[W]e must decide whether it was clearly established on August 11, 1985, that a citizen in peril for his life had a constitutional right that prevented a police officer from cutting off private avenues of lifesaving rescue without providing an alternative. We believe that this right was clearly established on that date."

*Ross v. United States*, 910 F.2d 1422, 1432 (7th Cir.1990).

In the following language the majority agrees that "having removed [K.H.] from [her parents'] custody the state assumed at least a limited responsibility for her safety," Majority at 849, and "[o]nce the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free." *Id.* As the majority also observes:

"[T]he state removed [K.H.] from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it

---

2. The fact of state custody of K.H. also distinguishes this case from *Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir.1990). In light of the state's custody of K.H., I refuse to join the majority's unnecessary speculation over whether K.H.'s parents should be considered "joint tortfeasors" with the defendants. *See* Majority at 850.

could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, *Estelle v. Gamble,* 429 U.S. 97, 103 [97 S.Ct. 285, 290, 50 L.Ed.2d 251] (1976), or the due process clause if he was awaiting trial. *Hamm v. DeKalb County,* 774 F.2d 1567, 1572–74 (11th Cir.1985), and cases cited there. In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions."

Majority at 849. The majority attempts to limit the state's duty with a statement that a rescuer would not "assume responsibility for [the child's] future welfare." Majority at 849. I disagree and reject the majority's analogy between the responsibility of a rescuer who just happens to extract a person from an imminent hazard and the duty a state exercises as a result of court-mandated custody over a child. The rescuer's duty obviously ends just after he has spared the victim of the harm with which that person was threatened. He is under no further responsibility to the person he has rescued. In contrast, the state's duty to the child results from the court's custody and control order and continues until such time as the order is withdrawn by a court of competent jurisdiction.

*Nelson, Estelle* and *Youngberg* recognize basic due process rights to freedom from unsafe conditions as well as to adequate treatment and care for those individuals who find themselves totally dependent upon the state while in its custody. In examining the adequacy of that treatment and care, courts should defer to the properly made judgments of qualified professionals. The *Youngberg* Court held:

"In determining what is 'reasonable'—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised *by a qualified professional.* By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there *certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.* See *Parham v. J.R.,* [442 U.S. 584, 607, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979)]; *Bell v. Wolfish,* [441 U.S. 520, 544, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)] (Courts should not ' "second guess the expert administrators on matters on which they are better informed" '). For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."

*Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62 (emphasis added, footnote omitted). If the state's foster care placement decision harms the child as a result of state agents' failure to exercise appropriate professional judgment in their care and supervision of the child, as alleged here, there is a violation of the clearly established due process norm set forth in the *Youngberg* case. As I read the majority's opinion, it agrees with this basic principle, and states that "the right to be free from ... governmental oppression" extends to "the case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified state action...."[3]

I do not mean to obscure the very real differences between the 24–hour scrutiny

**3.** Majority at 848. I disagree with the majority's formulation of this principle insofar as it can be read to increase the child's burden of proof and require demonstration of a "serious" impairment of mental health. It should be possible for a child to obtain recovery for an impairment of its mental health which is "significant," rather than the majority's mandate of a demonstration of a "serious" impairment.

state agents exercise over institutionalized persons and the obviously more limited supervision exercised in a foster home setting. As the majority notes: "Many students of child development believe that foster care is better for children than institutionalization,"[4] and I go beyond this to state that the vast majority of social workers, pediatric psychologists and psychiatrists almost uniformly hold that a properly licensed and supervised family foster home setting is far more beneficial to the proper development of a child than an institutional setting. In choosing the foster care alternative, the state obviously gives up some control in order to give the child a quasi-family home relationship. It would be un-realistic to expect the state to carry out the in-depth type of surveillance and supervision in a foster home that it carries out in the ever-controlled institutional setting; indeed, this type of oversight would defeat the very purpose of foster care by impairing and intruding upon the family-like setting which the state hopes will aid the child's proper development.[5]

Nonetheless, the difficulties of effectively supervising and monitoring children in foster care do not relieve the state of its basic obligation to make reasonable efforts to ensure the safety and well-being of the children for whom it has undertaken custody and care.[6] As the majority also proper-

4. Majority at 852.

5. In *Taylor by and through Walker v. Ledbetter*, 818 F.2d 791, 796 (11th Cir.1987) (en banc), the court made similar observations:

"Is a foster child involuntarily placed in a foster home in a situation so similar to that of a prisoner involuntarily placed in an institution that similar rules of law should be applied? We believe so. We recognize that the situations are not parallel. Obviously, a closer relationship exists between superior officers, subordinate officers, and the inmates within a prison than exists between a state agency, the foster parents, and the foster child in a foster care setting. In a penal institution, all the persons involved are in close and daily contact. Wardens and supervisors have the ability to daily monitor the activities of subordinates as well as the effect of certain conduct upon inmates. Although the contacts between actors in the foster home situation are not as close as in the penal institution, the situations are close enough to be held analogous. The lack of proximity in the foster home situation simply suggests that deliberate indifference is not as easily inferred or shown from a failure to act."

6. I also note that the state bases its argument upon the fact that it delegated its responsibility for the supervision of K.H.'s welfare to a private agency, Central Baptist Family Services. However, the state remained the guardian of K.H. and Central Baptist Family Services was acting on its behalf as its agent. Furthermore, the state's own regulations define as a "Department client," "a child or a family who is receiving child welfare services either directly from the Department, or through a purchase of service provider." 89 Illinois Administrative Code § 305.2. In addition, the state sets standards for the conduct of private child welfare agencies and is required to monitor children these agencies place in foster homes. Thus, it is clear that those persons to whom the state contracts its responsibilities for the supervision of the placement and care of foster children act as agents of the state. Merely because the state contracts out this work, it is not relieved of its duty to exercise the proper care or supervision of the child under the due process clause. As the Supreme Court observed in a case in which the state of North Carolina entered into contracts with private physicians to provide prisoners with constitutionally mandated medical services:

"Under state law, the only medical care [the prisoner] could receive for his injury was that provided by the State. If Doctor Atkins misused his power by demonstrating deliberate indifference to [the prisoner's] serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish [the prisoner] by incarceration and to deny him a venue independent of the State to obtain needed medical care.

... Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to [the prisoner]; the State delegated that function to respondent Atkins; and [Atkins] voluntarily assumed that obligation by contract."

*West v. Atkins*, 487 U.S. 42, 55, 56, 108 S.Ct. 2250, 2258, 2259, 101 L.Ed.2d 40 (1988) (footnote omitted). Similarly, the State bore an affirmative obligation concerning K.H.'s care and safety. Its use of a sub-contract with Central Baptist Family Services to provide these services under state supervision does not relieve the state of its duty to provide for K.H.'s care and safety and does not deprive K.H. of a necessary judicial remedy for the deprivation of constitutional guarantees.

ly observes: "It should have been obvious from the day *Youngberg* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibilities to irresponsible private persons, any more than a state could avoid its duty not to impose cruel and unusual punishments by turning over the management of its prisons to private correctional entrepreneurs known to inflict cruel and unusual punishments." Majority at 851–852 (citations omitted). As the majority also recognizes: "*Youngberg* made the basic duty of the state to children in state custody clear, and *Doe [v. New York City Dept. of Social Services]* added the obvious corollary that the duty could not be avoided by substituting private for public custodians." Majority at 852. I fail to understand how the majority can pick and choose in *Youngberg* and recognize one constitutional duty and at the same time hold that the duty to exercise professional judgment in placement and care decisions of foster children is not "expressly established by, or be clearly implicit in, existing case law...." Majority at 850 (applying *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Illinois has statutes and rules that recognize the need to review the case plan, present condition of the child, as well as facts relative to his care.[7] It is not too much to ask that the state honor its obligation to monitor the current *status and needs of the children dependent upon its care mandated within the parameters of its own regulations* and also to exercise adequate professional judgment in responding to the needs of these children.

7. A pattern of neglect of such obligations was also present in *Doe v. New York City Dept. of Social Services*, 709 F.2d 782, 786–87 (2d Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), where the court noted:

"As a placement agency, [the Catholic Home Bureau] had various statutory and contractual obligations. It was charged by state law with the task of annually recertifying the [foster] home. The Bureau also had a contractual agreement with the Department of Social Services of the City of New York by which it undertook, *inter alia*, to supervise the foster

The majority strains the law and intentionally limits the scope of protection to which a child in state custody is entitled when it states that the due process clause guarantees a "right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser.*" Majority at 852 (emphasis in original). I agree with the Supreme Court and would hold that the law in *Youngberg* struck the proper balance between the constitutional interests of a person who depends on a state for his or her care and the important societal purpose of minimizing federal judicial interference with the actions of state representatives:

"We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interest of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that 'the Constitution only requires that the courts make certain that *professional judgment in fact was exercised.* It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' [*Romeo v. Youngberg* ] 644 F.2d [147] at 178 [3rd Cir.1980) ]. Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. Cf. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). At the same time, this standard is lower than the 'compel-

home, to provide appropriate comprehensive services, and to submit periodic reports concerning the placement so that the City could monitor the situation. Plaintiff's evidence showed, however, that there were some lengthy periods when no Bureau personnel visited the [foster] home, and that these gaps came at critical times under the events of this case."

(citation omitted). This complaint before us similarly alleges that state agents failed to comply with requirements imposed under state law.

ling' or 'substantial' necessity tests the Court of Appeals would require a State to meet to justify use of restraints for conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and it would also restrict unnecessarily the exercise of professional judgment as to the needs of residents."

*Youngberg,* 457 U.S. at 321–22, 102 S.Ct. at 2461 (emphasis supplied). As the *Youngberg* court went on to emphasize:

"In determining what is 'reasonable'—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. See *Parham v. J.R.,* [442 U.S. 584, 607, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979)]; *Bell v. Wolfish,* [441 U.S. 520, 544, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)] (Courts should not ' "second-guess the expert administrators on matters on which they are better informed" '). For these reasons, the decision, if made by a professional, is presumptively valid; *liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."*

*Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62 (footnotes omitted) (emphasis supplied). Clearly under *Youngberg* the controlling test is solely whether state actors exercised appropriate professional judgment in each of their decisions. However, the majority for some reason increases the burden of proof for K.H. and derives and creates a significantly more stringent standard from *Youngberg:* "Only if without justification based either on financial constraints or on considerations of professional judgment [state actors] place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability and damages." Majority at 854. There is no language in *Youngberg* which would reasonably permit one to create any standard other than that of "substantial departure from accepted professional judgment, practice or standards" to govern a child welfare decision or that would limit the application of this standard only to cases where there is a demonstration that the state placed a child with persons it knew or suspected to be child abusers as the majority has.[8] Rather, *Youngberg* clearly establishes that we are to apply the standard of "professional judgment" to every case where there is an allegation that the state failed to provide the care and supervision required under the Due Process Clause. Thus, in order to follow the dictates of the Supreme Court, I refuse to join the majority in limiting the liability of state actors only to those cases where a state agency places a child in the hands of foster parents *it knew or reasonably suspected to be child abusers.*

I would note that the Supreme Court has not placed such limits upon the state's duties to an incarcerated criminal, and I see no reason why we should impose such a limit when exercising custody over helpless children. Prisoners have a right to protection from prison officials' deliberate indifference to their need for "reasonable protection from harm inflicted by other inmates." *DeMallory v. Cullen,* 855 F.2d

---

**8.** As discussed *infra,* language in *Youngberg* regarding budgetary constraints is merely an application of the professional judgment standard. *See Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462 ("In an action for damages against a professional in his individual capacity, however, the professional will not be liable *if he was unable to satisfy his normal professional standards because of budgetary constraints;* in such a situation, good-faith immunity would bar liability.") (emphasis added).

442, 445 (7th Cir.1988).[9] Because "in America we respect the sanctity of human life," *Walsh v. Mellas*, 837 F.2d 789, 798 (7th Cir.1988), I am convinced that the value of the life and welfare of a helpless infant foster child over whom the state exercises guardianship calls for the state to exercise the same type, if not an increased, level of vigilance in the child care area as it is required to exercise when caring for criminals under its custody. As in *Walsh*, the "increased administrative burden" resulting from proper review and evaluation of foster homes before placement "is inconsequential compared with the value of a proper screening process [in] protecting human life...." 837 F.2d at 798.

I am confident that the duties owed to a foster child under *Youngberg* demand only that state actors exercise appropriate professional judgment in the placement and care of the child and thus are consistent with our decision in *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir.1989). In *Bobbitt*, the abused child was removed from her mother's care and temporarily placed in the home of another familial relative, an aunt. *Bobbitt* explicitly makes clear the distinction between the placement with a relative

and the placement in a licensed foster home as in *Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1981), and this case. Thus, it is clear that we are dealing with a different factual setting in *Bobbitt* (i.e., placement with a relative) which required a lower level of state supervision than K.H.'s placement in licensed foster care.[10] K.H.'s case is further distinguishable from *Bobbitt* in that *Bobbitt* did not involve allegations of frequent transfers (shuttling) between foster homes or lack of care in a foster home setting. Thus, holding unconstitutional the lack of professional judgment exercised in the "general practice of shuttling children among foster parents" or the provision of basic care to foster children would not require an overruling of *Bobbitt*. Because we are at the motion to dismiss stage in the trial, this case should be allowed to proceed to trial on this issue to determine whether professional judgment was properly executed under *Youngberg*.

As I discussed previously, *Youngberg* clearly establishes that we must apply the standard of a state actor's reasonable professional judgment to each decision regard-

---

**9.** This right can be particularly important to a prisoner whose safety would be threatened if he were placed in an area of the prison where he could be the victim of hostile activities of prison gangs. In *Walsh v. Mellas*, 837 F.2d 789, 798 (7th Cir.1988), we compared the burden the government shoulders in protecting prisoners' safety in prison placement decisions with the vast importance of the values of human life and control of gang-related violence that are furthered when placement decisions are made with a recognition of gang-related threats to the safety of prisoners:

> "We firmly believe that the failure of prison authorities to even review an inmate's file to determine his or her proclivity for violence and/or whether they are a gang-target in the face of gang-related threats and violence manifest utter disregard for the value of human life. This we will not condone, for in America we respect the sanctity of human life, including those confined in penal institutions.

The increased administrative burden that the defendants assert a decision in Walsh's favor would impose upon the prison system is inconsequential when compared with the value of a proper screening process protecting human life and curbing gang-related violence. Defendants concede that some on-the-spot

screening of an inmate's size and experience with other inmates is currently performed with respect to the more permanent housing of double-celled inmates. The added burden of reviewing the inmate's file is not substantial. We agree with the district court that pursuant to *Duckworth [v. Franzen*, 780 F.2d 645 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986) ], the fact that 'the plaintiff was, and was known to be ... a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem; and that the two defendants, Mellas and Martin, devised and operated a security system which ignored that risk in that targeted inmates in investigative status were housed with other prisoners without any determination of whether those other prisoners were members of a vengeful gang,' triggers an Eighth Amendment violation."

**10.** The majority likewise recognizes that "*Bobbitt* is distinguishable from the present case," Majority at 853, and that "there is indeed a difference between placing a child with a member of her family and placing the child with a foster parent." Majority at 852. The majority, therefore, makes the same distinction, and we are in agreement on this point.

ing a foster child's care or placement. Based upon this legal proposition, the trial court should be required to apply the standard of a state actor's reasonable professional judgment to at least three of the allegations of K.H.'s complaint which I am convinced survive an attack based on qualified immunity in the context of a motion to dismiss: the claims of improper placement decisions; the assertions of failure to professionally review, supervise or plan for the child; and the contentions of failure to provide necessary psychological care.[11] Initially, in the majority's view, the thrust of K.H.'s challenge was that the involved state agents allegedly harmed her by failing to exercise appropriate professional judgment in their placement of K.H. with a foster parent who was incapable of meeting K.H.'s special emotional needs.[12] This allegation should be sufficient to meet the test of a motion to dismiss, as the plaintiff at the pleading stage is only required to prove a set of facts on which relief may be granted. As we observed in *Toth v. USX Corp.*, 883 F.2d 1297, 1298 (7th Cir.1989):

> *"Because we are reviewing the district court's dismissal of the plaintiffs' complaint, we will take all well-pleaded allegations as true, permitting dismissal only if the plaintiff could not prove any set of facts upon which relief might be granted.* As we have noted many times, the complaint merely serves to put the defendant on notice and is to be freely amended or constructively amended as the case develops, as long as amendments do not unfairly surprise or prejudice the defendant. *Clearly, if we can see at this early stage in the development of the case that there exists a material issue of fact that would render the case unsuitable for summary judgment later on, we would certainly refuse to permit dismissal. Similarly, just as we would draw inferences in favor of the nonmoving party in reviewing a grant of summary judgment, we give the plaintiffs the benefit of the doubt in reviewing the dismissal of their complaint."*

(Citations omitted) (emphasis added). I am not convinced, based on the state of this record, that the state actors are liable for any of the constitutional violations alleged herein, and it may well be that the facts presented at trial will establish that the governmental representatives involved did exercise reasonable and proper professional judgment in their placement decisions. This responsibility should include an in-depth investigation and evaluation of the foster home including but not limited to the foster parents, other individuals in the home, the neighborhood as well as the foster parents' capability of accepting responsibility for the care and custody of the child. But, the issue of whether state actors exercised professional judgment in an appropriate, acceptable manner is one to be made after full litigation during a trial on the merits. As the court recently commented in *Ross v. United States*, 910 F.2d 1422, 1424 (7th Cir.1990):

> "The allegations in the plaintiff's complaint portray a stunning abuse of governmental power. Because we review this case after successful motions for summary judgment and for dismissal of the complaint, we have taken the facts in the light most favorable to the non-moving plaintiff and have drawn all possible

---

**11.** The multi-faceted nature of the state's duties toward K.H. means that the facts presented at trial might well demonstrate that state agents adequately fulfilled certain aspects of their constitutional duties toward K.H., while failing to fulfill other aspects of their duties. As the Second Circuit noted in *Doe:* "The fact that the agency may have been attentive to [the foster child's] general care and provided [the foster child] with general services did not preclude a jury finding of deliberate indifference representing one very significant aspect of her welfare, the protection from abuse." 709 F.2d at 791 (citing *Murrell v. Bennett,* 615 F.2d 306, 310 n. 4

(5th Cir.1980) (one episode of gross misconduct with respect to prisoner's medical care not necessarily excused by general pattern of attentiveness)).

**12.** It is unfortunate that K.H.'s complaint is not pleaded as clearly as it might be with respect to just which placement decisions she challenges. The majority focussed primarily upon the "penultimate" placement and my current discussion similarly concerns this placement. However, K.H.'s complaint may also be read to be concerned with other foster care placements.

inferences in her favor. Thus, we have outlined the facts with these principles in mind, and our recitation should not be interpreted as an opinion on the veracity of any of the plaintiff's allegations. In addition, it should be remembered that none of the actors in this tragedy have had their day in court to disprove the plaintiff's claims."

Based upon the language in *Ross* emphasizing the necessity in a motion to dismiss to view "the facts in the light most favorable to the non-moving plaintiff," to "draw[ ] all possible inferences in her favor," and to "remember[ ] that none of the actors in this tragedy have had their day in court," I believe it is improper for us not to give the same consideration to K.H.'s case as to Ross'. We should not cast aside the legal test mandated in *Youngberg* and substitute therefor the majority's more stringent standard. Furthermore, it becomes more difficult to bring an action to rectify an errant judgment of the welfare department with the majority's new standard holding a defendant liable only in the case of *placement with a known or suspected child abuser.*

Secondly, I am of the opinion that the allegations regarding K.H.'s "9 placements in a period of approximately three and a half years," [13] together with the serious traumatic experiences (physical and sexual assaults) K.H. suffered during these myriad placements might conceivably establish a violation of the due process clause as to care and judgment as *Youngberg* recognized. Thus, K.H. must demonstrate that the conduct of the state agents resulted from their failure to exercise reasonable professional judgment in their placement and supervision decisions during the years 1985–87. Although the majority recognizes the underlying danger of these frequent transfers, [14] it characterizes K.H.'s claim concerning the shuttling process be-

tween various foster homes as "novel" and refuses to follow the law as set forth in *Youngberg* which requires a trial court to make a determination of whether the state agents' actions were an exercise of reasonable professional judgment. In refusing to apply the Supreme Court's controlling standard of a state actor's reasonable professional judgment, the majority applies an unduly restrictive reading of *Youngberg* and casts aside the duty on the part of the state to exercise this judgment in protecting the physical and psychological well-being of children in its custody. Whether or not the factual background of this case has heretofore been presented does not somehow limit *Youngberg*'s holding. Contrary to the underlying premise of the majority's opinion, the state's responsibility to exercise appropriate professional judgment was clearly established in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Thus, the state actors should have been aware of their duties regardless of the particular placement setting in which they placed K.H. while a ward of the state.

The third component of K.H.'s complaint is her claim that state agents denied her appropriate care while in state custody. I agree with the district court and hold that the motion to dismiss should not bar K.H.'s claim that the due process clause imposed upon the state a responsibility to provide a foster child with necessary care, possibly including psychological counseling. *See K.H. v. Morgan*, No. 87 C 9833, slip op. at 20–22 (N.D.Ill. September 6, 1989). The trial court also concluded that qualified immunity did not bar assertion of this claim against the involved individual defendants. *See id.* at 31–32. The court's action was an application of the principle established in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), that "[w]hen ... a person is institutionalized or is a ward of the state, and wholly depend-

---

13. *K.H. v. Morgan*, No. 87 C 9833, slip op. at 19, 1989 WL 105279 (N.D.Ill. September 6, 1989).

14. The majority states:
    "To change an infant's parents nine times in four years not only is suggestive of profound disarray in the state's system of caring for abused and neglected children; more to the point, it may—though this depends on the state of mind with which the authors of this shuttle, the defendants, acted—bespeak violations by these state actors of their constitutional obligations."
    Majority at 848.

ent on the state, a duty to provide certain services and care does exist." *K.H.*, slip op. at 21. In contrast, the majority's decision seems to limit its focus to the state actors' liability for foster care placement decisions and fails to specifically address the important question of state representatives' responsibility for providing necessary care (medical and psychological) while in state custody.

Although under *Nelson, Estelle* and *Youngberg,* state agents have an obligation to exercise professional judgment in providing foster children with adequate treatment, this duty is not a broad entitlement. Because state actors, when dealing with a foster child's problems, are not required to " 'choose between attacking every aspect of a problem or not attacking the problem at all,' "[15] the duty to provide proper treatment does not require medical or dental care that might be classified as discretionary. For example, adequate care would certainly require that the state provide the child with necessary immunizations and insure the child's school attendance. While a state would be expected to provide a foster child with basic dental care, it is not required to provide discretionary orthodontic care. Conversely, a state should certainly be required to provide a

child with a necessary prosthesis in the case of a child's amputated or deformed limb to allow him or her to navigate and live as normal a life as possible, or to provide eyeglasses to enable the child to see and not impair his educational pursuits. In a case such as ours, I am of the opinion that a physically, emotionally and sexually abused child is entitled to counseling and therapy to remedy mental and psychological problems, when qualified medical judgment mandates.[16] Such treatment would not be required in all cases unless we were convinced that there existed a serious threat to the child's present and future emotional well-being. The key point is that in all of these decisions courts must defer to the judgment of qualified professionals,[17] and *liability will be imposed only if the professional decision concerning treatment "is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462 (emphasis added). The optimal situation would be for qualified, state-employed social workers and medical professionals to cooperatively determine

**15.** *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458 (quoting *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970)).

**16.** The severity of this child's psychological problems are reflected in the file, i.e., engaging in disturbed behavior, screaming, rolling around on the floor, squeezing her hands around her neck as if trying to choke herself and chewing around the cap of a can of lighter fluid.

**17.** Employees of the Illinois Department of Children and Family Services responsible for the delivery of child care services must be certified as a child welfare specialist or child protective investigator under the Child Protective Investigator and Child Welfare Specialist Certification Act of 1987, Ill.Ann.Stat. ch. 111, para. 7651 *et seq. See* Ill.Ann.Stat. ch. 23, para. 5021(d). Certification requirements under the Act include the possession of a bachelor's degree in an area related to human services such as law enforcement, police science, criminology, social work, early childhood development or psychology, successful completion of a DCFS approved ex-

amination and completion of a course of training DCFS develops. *See* Ill.Ann.Stat. ch. 111, para. 7655; ch. 23, para. 5021(d). Twenty hours of in-service education and training every two years is necessary to maintain certification. Ill. Ann.Stat. ch. 23, para. 5021(d). The state does not require that child welfare employees employed with private child welfare agencies, such as Central Baptist Family Services, receive this same certification. However, DCFS does set minimum educational requirements for the "child welfare workers" employed by these agencies. *See* 89 Ill.Administrative Code § 401.13. If employees of the private agency are performing the duties of a social worker, they must be licensed under the Clinical Social Work and Social Work Practice Act, Ill.Ann. Stat. ch. 111, para. 6351, *et seq.* That Act provides that social workers must successfully complete an examination which the Department of Professional Regulation administers and that social workers meet minimum educational and/or experience qualifications of either a graduate social work degree or an undergraduate social work degree with three years of supervised professional experience. *See* Ill.Ann.Stat. ch. 111, para. 6359A.

the appropriate medical care and therapy these children need.

State representatives' decisions concerning K.H.'s care must involve the exercise of professional judgment in their attempts to address all of the problems dealing with K.H.'s appropriate treatment in the foster care setting. Supervisors in state agencies should guide, direct and aid employees in rendering professional decisions. The state must provide proper and adequate supervision and training, as well as regulations, updated seminars or programs designed to ensure to the best of its ability that the decisions affecting children awarded to its custody are professionally made, based upon the most recent knowledge and teachings in their particular field of expertise.

For example, the State of Wisconsin has a regulation for determining whether supplemental payments are required to provide the proper care for particular foster children. *See* Wisconsin Administrative Code § HSS 56.09 (1990). The state regulation establishes criteria for child welfare workers to apply in determining whether foster children exhibit special emotional, behavioral and physical needs. *See id.* One Wisconsin county has gone so far as to establish an "Intensive, In-home Services Unit" in which teams of two social workers work with children with very difficult problems, together with the members of the children's family, while the children remain within the family unit. Those who supervise state child welfare professionals also could help assure that decisions regarding the care of foster children resulted from professional judgment through devotion of more of their time and resources to the training and oversight of child welfare professionals to ensure that qualified state agents visit foster homes with sufficient frequency to adequately monitor children's foster care arrangements. The criteria a state uses to make certain that its child welfare professionals adequately exercise the proper judgment necessary to protect the constitutional rights of the children in the state's custody are for the legislative and executive branches of government to devise, implement, update and control. The judiciary's sole duty, which I trust will be exercised only in a very limited scenario, is to make certain that constitutional guarantees of the proper level of care and safety will ensure that the state, through its agents, implements reasoned professional judgment and supervision.

As a final note, I do realize that *Youngberg* contains some language which suggests that a professional will not be liable if budgetary constraints are at the root of his failure to exercise professional judgment in placement or treatment decisions.[18] But, it is imperative that there be a demonstration that the professional's reliance upon the justification of budgetary constraints was made in "good faith," which certainly has not been established herein. In addition, this language is based upon principles of "good faith" immunity that no longer provide a basis for qualified immunity in an action brought under 42 U.S.C. § 1983 following the Supreme Court's decision in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Furthermore, the majority properly notes that, in an appropriate case, "[t]he officials responsible for the inadequacy of those resources might be liable in damages, provided they were sued in their personal rather than official capacities...."[19] There is something deeply repugnant about the legislative branch of the government posturing for the voters while mandating and prescribing child welfare protection laws and then refusing to appropriate the funds necessary to comply therewith. If and when the legislature makes a reasoned policy judgment as to its priorities, it must appropriate the necessary funds to deal with these potentially high-risk children

---

**18.** The involved language reads: "In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462.

**19.** Majority at 853–54. In our case the defendants were sued in their personal capacities.

who may eventually live lives of crime or destitution if not properly treated. But, as the district court properly observed in its opinion, any pronouncements concerning budgetary constraints are "premature at this point because on a motion to dismiss the court takes as true the factual allegations of the complaint. Nowhere does the complaint allege any facts regarding budgetary problems." *K.H. v. Morgan*, No. 87 C 9833, slip op. at 32 (N.D.Ill. September 6, 1989). Thus, in answer to the majority's statement on the subject of "whether, if the suit fails, there is any source of public or private funds for defraying [K.H.'s psychological treatment] expenses," Majority at 848, it is obvious that we must leave this matter to the trial court's consideration until such time when and if liability is established.

I do not wish to intrude on legislative functions, and I well recognize that courts certainly have limited competence to address the essentially legislative questions that concerns over budgetary questions raise. Nonetheless, it has oftentimes been said, and I agree, that children are our most important heritage. Money the state chooses to spend to effectively raise and rear those unfortunate children under its guardianship will prove a sound investment in the future if the expenditure avoids the cost and human suffering the state will later face if these same children turn to lives of crime and destitution, become emotionally disturbed and/or are otherwise unable to function effectively in society. Illinois would then avoid the prospect of large institutional expenses for imprisonment or hospitalization together with the costs associated with the suffering and harm these children ultimately may endure or inflict upon others. Furthermore, the present expenses the state must incur I trust will not be as great as one would expect for it is an accepted fact that foster care is more inexpensive than institutionalization since many, many foster parents act altruistically for the satisfaction of contributing to a child's welfare and to society rather than for economic reward.

With respect to the question of absolute immunity, the majority holds:

"We reject the defendants' alternative contention that they are entitled to *absolute* immunity from damages liability. So far as relevant to this case, absolute immunity has been confined to participants in judicial or judicial-type proceedings, such as judges, witnesses and prosecutors. We may assume that a caseworker who initiates a proceeding to remove a child from its parents' custody, or who executes an order made by a judge in a juvenile proceeding, enjoys absolute immunity. *Babcock v. Tyler*, 884 F.2d 497 (9th Cir.1989). This is not such a case—there was a juvenile court proceeding, but the defendants have not pointed to any court orders commanding them to place K.H. with particular foster parents...."

Majority at 854 (emphasis in original).

But, state courts rarely, if ever, specifically delineate the particular foster home or institution in which state agents should place a child; rather, as in this case, they are placed in the custody of the Department of Children and Family Services (Illinois). The complaint does mention several relevant judicial orders. The complaint notes that: "In August 1983, the court issued a Juvenile Arrest Warrant, which authorized the police to take custody of K.H." First Amended Complaint at ¶ 9. Further, "[o]n October 12, 1983, the Juvenile Court placed plaintiff in the custody of DCFS." *Id.* at ¶ 10. The complaint also alleges: "On January 31, 1985, the Juvenile Division of the Circuit Court of Cook County ordered the return of K.H. to her parents, under DCFS supervision." *Id.* at ¶ 14. Likewise, "[o]n April 30, 1985, the Juvenile Court granted guardianship of K.H. to DCFS." *Id.* at ¶ 16. There is nothing in the complaint that authoritatively precludes the possibility that the state actors could demonstrate that their placements of K.H. were made pursuant to court orders that remove the exercise of discretion from the state agents' placement decisions. The complaint alleges only court orders which in general terms "grant a guardianship of K.H. to DCFS" or "place plaintiff in the custody of DCFS," without

specifying limitations on placement discretion. In contrast to the majority's example of a particular foster home placement and because we do not have the relevant court orders before us in the record, we are without the information necessary to authoritatively conclude that the state actors lack absolute immunity. My conclusion is not affected by the fact that absolute immunity is a defense which the defendants are required to establish. In the context of a motion to dismiss, a defendant, even if he bears the burden of establishing a particular issue, is under no obligation to present the facts that would demonstrate an immunity defense at the risk of being foreclosed from any future consideration of this issue. Had K.H. filed a motion for summary judgment, the defendants would have been required to present facts necessary to support their absolute immunity defense. Because the majority refuses to consider the state's proffer of the juvenile court transcript in resolving any of the issues contained herein, it is at the very least quite inconsistent for the majority to suggest that the defendant present this type of extrinsic factual support (texts of relevant judgments) to avoid a conclusion that its absolute immunity defense is barred. Thus, because we do not have the juvenile records before us, the district court should consider the absolute immunity issue on remand, and the litigants should not be barred from an opportunity to establish the doctrine of absolute immunity.

I agree with the majority that K.H.'s "complaint paints an ugly picture of official neglect of human misery." Majority at 848. In my view *Youngberg* clearly established in the year 1982 a basic duty on the state to protect, supervise and care for children who are in its custody and state agents are not relieved of their responsibility to these children when they select a foster home rather than an institution as the means to care for these children. The children are entitled to the same care no matter how the state sees fit to accomplish its responsibilities. After *Youngberg* was decided in 1982 there was a clearly established responsibility to provide appropriate protection, supervision and care for children in the state's custody whether the state used a central institution or some other form of placement to accomplish its responsibilities, and I believe that it is essential that we recognize this duty in this particularly appalling factual scenario. As the court commented in *Ross*, "it should be remembered that none of the actors in this tragedy have had their day in court to disprove the plaintiff's claims." 910 F.2d at 1424. I believe that K.H. and the parties to this case, as the parties in *Ross*, are entitled to their "day in court" to resolve K.H.'s claims. I would affirm the district court's decision denying the state agents' qualified immunity and remand the case for trial, including determination of the question of absolute immunity, thus allowing the plaintiff to develop a complete record in the hopes of piercing the veil of an alleged tragic scenario of state actors casting our unfortunate brethren (infants) on a sea of human misery through official neglect.