Sherry LINTZ, Keith Lintz, Sr., and Richele Nicole Jacobs, Brian Allen Jacobs and Keith James Lintz, Jr., by next Friend, Sherry Lintz, Plaintiffs,

v.

Linda K. SKIPSKI, Kendall Krause, Shirley Krause, Dale Krause, individually and in their official capacities, and Cass County Department of Social Services, and Other Unnamed Co–Conspirators, jointly and severally, Defendants.

No. 1:92–CV–83.

United States District Court,
W.D. Michigan, S.D.

Feb. 23, 1993.

Robert A. Yingst, Holly F. Underwood, Boothby & Yingst, Berrien Springs, MI, for plaintiffs.

Charles C. Schettler, Jr., Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Tort Defense Div., Lansing, MI, James M. Straub, Straub, Seaman & Allen, St. Joseph, MI, Richard H. Winslow, Cummings, McClorey, Davis & Acho, PC, Battle Creek, MI, Gary R. Peterson, Oosterbaan, York, Cooper & Peterson, Kalamazoo, MI, for defendants.

## OPINION ON PLAINTIFFS' MOTION FOR RECONSIDERATION AND DEFENDANT MITCHELL WALKER'S MOTION FOR SUMMARY JUDGMENT

QUIST, District Judge.

Plaintiffs, parents and three children, brought this Section 1983 action, claiming that the children had been deprived of their constitutional rights while in foster care by being made subject to sexual, physical, and emotional abuse. Defendants included Linda Skipski, a Cass County social worker ("Skipski"), Kendall and Shirley Krause, the foster parents, and Dale Krause, their son (collectively the "Krauses") and the Cass County Department of Social Services (the "County"). Defendants Skipski, the Krauses, and the County moved for dismissal or summary judgment. Their motions were granted in an Opinion and Order filed November 25, 1992. 807 F.Supp. 1299.

Plaintiffs have now moved for reconsideration of portions of the Opinion and Order. They argue that the defendants were not entitled to qualified immunity because plaintiffs' rights were clearly established at the time of the alleged violations and also ask for reconsideration of their conspiracy claim. This Court has reconsidered and reaffirms its Opinion. Its holding on qualified immunity, however, merits further explanation.

### Qualified Immunity

■ The qualified immunity doctrine shields government officials performing discretionary functions from civil damages liability, provided their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

As the Sixth Circuit recently explained in *Meyers v. City of Cincinnati,* 979 F.2d 1154 (6th Cir.1992) the doctrine of qualified immunity is based on the policy that the public is better served if officials are free to act with independence and without fear of consequences when their duties require action in areas where clearly established rights are not implicated. *Id.* at 1156, citing *Harlow v. Fitzgerald,* 457 U.S. at 819, 102 S.Ct. at 2738. The qualified immunity doctrine attempts to balance, on the one hand, the need to protect officials who are required to exercise their discretion and the interest of the public in the vigorous exercise of public authority against, on the other hand, the availability of a damages remedy to protect the rights of citizens. *Id.*

An official seeking immunity "bears the initial burden of showing that public policy requires such an exemption. *Id.* The burden then shifts to plaintiff to show "facts that, if true, defeat the assertion of the doctrine." *Id.*

■ Qualified immunity protects officials from being subject to suit, thereby providing a layer of protection in addition to the defense that they exercised a *"bona fide* professional judgment as to where to place children in their custody" which is still available if immunity is denied. *K.H. ex. rel. Murphy v. Morgan,* 914 F.2d 846, 854 (7th Cir.1990) (*"Murphy"*).

This Court held that the right of foster children to be free from the infliction of unnecessary harm, which plaintiffs claim, was not clearly established in the period of time in question, May 1987 through November 1990. Linda Skipski was thus afforded qualified immunity.

### The Rights of Children in Foster Care as Established by the Supreme Court and Other Jurisdictions

Plaintiffs argue that the Court defined too narrowly what was required to make constitutional duties "clearly established." The Sixth Circuit held that the law should not be considered "clearly established" unless it is controlling law authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state. *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988).

Plaintiffs maintain that the right they assert was clearly established by the Supreme Court and thus was established in this jurisdiction. Plaintiffs cite *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which held that the state had a duty to provide adequate medical care to incarcerated prisoners, and *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), which held that state had a duty to provide a person in a state home for the retarded with services necessary to insure reasonable safety. Plaintiffs also point to several federal court opinions issued between 1983 and 1990 which held that children in foster homes have a right to be protected from harm: *K.H. ex. rel. Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990); *L.J. v. Massinga,* 838 F.2d 118 (4th Cir.1988); *Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dept. of Social Services,* 709 F.2d 782 (2d Cir.1983), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

The *Murphy* decision is most pertinent to the issue before this Court. In *Murphy* the Seventh Circuit discussed in depth whether the right claimed by a foster child was clearly established at the time of the alleged violation. 914 F.2d at 850–53. The court noted that for liability to attach, plaintiff cannot assert merely a general due process right but must show that the specific right asserted by the plaintiff has been "either expressly established by, or clearly implicit in" existing law. *Id.* at 850. The fact that liability can be predicted is not enough to justify denial of immunity. *Id.* at 851.

In *Murphy* the claim, in part, was that defendants had deliberately placed a child in a succession of foster homes known to be inadequate. The court held that the Supreme Court, in *Youngberg v. Romeo,* had clearly established the duty, on the part of state officials, "to take steps to prevent children in state institutions from deteriorating physically or psychologically." *Id.* The court stated the duty articulated in *Youngberg* clearly extended to children in foster care because "[i]t should have been obvious from the day *Youngberg* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibilities to irresponsible private persons." *Id.* The court thus denied immunity to defendants on charges of placing children with foster parents having a known propensity to neglect or abuse children on the grounds that "*Youngberg* made the basic duty of the state to children in state custody clear, and *Doe [supra]* added the obvious corollary that the duty could not be avoided by substituting public for private custodians." *Id.* at 852. The court added that "no case held the contrary and there was no reason to think that *Doe* would not be followed by this circuit." *Id.*

In this Court's November 25, 1992, Opinion, the issue was described as "whether the right of a foster child to be free from unnecessary harm was sufficiently clear between May 1987 and November 1990 so that 'a reasonable official would understand that what he was doing violated the law.'" Opinion at 1304 (quoting *Poe v. Haydon,* 853 F.2d 418, 423–24 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989)). Although *Murphy* presents a compelling analysis for concluding that the right of a foster child to be free from unnecessary harm was clearly established during this period, nevertheless, qualified immunity must be provided to Skipski under the facts of this

case and the law of the Sixth Circuit regarding qualified immunity and its opinions regarding duties toward foster children.

### Sixth Circuit Law on Duties to Children in Foster Care

The Sixth Circuit cases directly relevant to whether the right of foster children to be free from unnecessary harm was clearly established are *Eugene D. v. Karman,* 889 F.2d 701 (6th Cir.1989) *cert. denied,* 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990), which held that the right was not clearly established from 1974 through 1982, and *Meador v. Cabinet for Human Resources,* 902 F.2d 474 (6th Cir.1990), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990), which determined that children in state-regulated foster homes have a substantive due process right to "be free from infliction of unnecessary harm." *Id.* at 476.

In *Karman,* the court of appeals discussed the implications of *Youngberg* on a state's duty toward children placed in foster care rather than in an institution. That discussion makes it impossible for this Court to hold that the obligations of state foster care workers were clearly established prior to the *Meador* decision. The *Karman* court stated that "a child placed in foster care is at least arguably not in custody in the sense of *Youngberg.*" 889 F.2d at 710. The court reasoned that because foster care, by design, provides a home-like setting, "the control the State may exercise over the child and thus the protection it may provide him with is diminished." *Id.* Declining to regard the Second Circuit's decision in *Doe* as dispositive, the court held that the differences between institutional and foster care "raise serious questions as to whether foster care placement is sufficiently analogous to institutionalization so that a reasonable official would understand that, as a matter or law, the Fourteenth Amendment's Due Process Clause imposed similar affirmative obligations on him or her." *Id.* at 711. As to the authority of *Doe* in this Circuit, the *Karman* court said:

> As noted above, however, our court will not be easily swayed by the decisions of circuit and district courts other than our own when determining whether a constitutional right has been clearly established in this

circuit. Here, only a single circuit court and a single district court, both outside of our jurisdiction, had recognized the right in question during the time period that Eugene's rights were allegedly violated. *Harlow's* "objective legal reasonableness" test does not require state officials to know and to follow the most advanced state of the law as established by a remote court of the land. Accordingly, we are convinced that these cases alone do not, as a matter of law, clearly establish in our circuit, during the relevant time period, the constitutionally imposed affirmative obligations Eugene claims are at issue in this case. (Citations omitted.)

889 F.2d at 708.

Thus, those under the jurisdiction of the Sixth Circuit cannot say, as the *Murphy* court said, that the rights of children in foster care were clearly established by *Youngberg* because "there was no reason to think that *Doe* would not be followed in this circuit." 914 F.2d at 852. As the discussion in *Karman* shows, foster care workers in Michigan had good reason to think that the Sixth Circuit would not follow *Doe.*

The status of the law changed, however, in May, 1990, when the court in *Meador* followed *Doe* and held that children in foster care had a due process right "to be free from the infliction of unnecessary harm." 902 F.2d at 476. After *Meador* was decided, the right of children in foster care to be free from the infliction of unnecessary harm is clearly established in this jurisdiction. It remains for this Court to determine whether and to what extent that right is implicated in the instant case in the critical time period of June through November 1990.

■ Plaintiffs' complaint claimed the children's rights were violated through a series of actions and inactions from the time they were placed in the Krause home in May 1987 through November 1990, when they were removed from the placement. Plaintiffs argue that the children should not have been placed with Krauses from the start because Skipski knew or should have known the Krause home was unsuitable as a foster home and that Skipski should have removed the children from the home immediately when a claim of sexual abuse was clearly

articulated on October 8, 1990. Plaintiffs also chronicle a series of events that they allege should have alerted Skipski to the abuse the children allegedly received, including two incidents in 1988 and an incident on October 2, 1990.[1] Mrs. Krause reported on October 2, 1990, that one of the Lintz boys had said to the other "you pull my pants down and I'll pull your pants down." Plaintiffs claim that these incidents required immediate investigation and action.

Of plaintiffs' allegations, only those that occurred in mid-1990 through the removal of the children from the Krauses' home in November, 1990 can be considered. The others fall within the period during which foster care workers enjoyed qualified immunity for all their actions in this jurisdiction. Thus, the only claims at issue are the allegations that the October 2, 1990, incident should have prompted an investigation and that the children should have been removed from the Krause home immediately after the allegation of abuse was made on October 8, 1990. In essence, plaintiffs are asserting that the incident reported to Skipski constitutionally obligated her to conduct an investigation and that, at the time an explicit allegation of abuse was made, Skipski was constitutionally obligated to remove the children from the foster home immediately.

The pleadings and the affidavits and documents submitted in connection with the motion for summary judgment show that, when the accusations of sexual abuse were made on October 8, Skipski took immediate action to protect the children. She met with Mrs. Krause and set up safeguards to insure that the children were fully supervised and would not suffer any abuse before they were moved. Skipski searched for a place to send the children and discussed emergency placement with the attorney for Mrs. Lintz and the guardian-ad-litem for the children, both of whom apparently opposed moving the children immediately.

The claims plaintiffs raise and the facts presented concerning immunity do not present a case like *Murphy*, in which defendants allegedly placed a child in harm's way, in disregard of her rights, by putting her in a succession of foster homes known to be deficient. When analyzed under applicable law, these facts support qualified immunity for Skipski. In *Poe v. Haydon*, 853 F.2d 418, 427 (6th Cir.1988), the court considered a claim that state officials had failed to conduct a proper investigation of alleged sexual harassment and failed to take particular steps following the investigation. The court noted that plaintiff's superiors conducted investigations after they were alerted to possible sexual harassment and held that plaintiff "did not have a clearly established constitutional or statutory right to a specific outcome following an investigation." *Id.*

In the instant case, plaintiffs have not established that the reports of talk between brothers of pulling each other's pants down create a constitutional right to an investigation of the foster placement or any particular action. As soon as allegations of sexual abuse arose, Skipski took actions to protect the children. Under the declaration in *Meador* that children in foster care have the right to be "free from unnecessary harm," the children had a constitutional right to have protective action taken. They did not, however, have a clearly established right to the specific actions plaintiffs claim should have been taken.

Applying the test recently reiterated by the Sixth Circuit, plaintiffs have shown neither that a clearly established right was violated by Skipski nor that a reasonable social worker in Skipski's position should have known that the conduct at issue violated that right. *Meyers v. City of Cincinnati*, 979 F.2d at 1156. Thus, Skipski is entitled to qualified immunity for the time period after the *Meador* decision as well as the earlier period.

### Conclusion

The decision to grant Skipski qualified immunity was correct for the reasons stated above. Although the right of foster children to be free from unnecessary harm was clearly established in *Meador* in May, 1990, the right plaintiffs assert to an investigation and a particular outcome are not clearly established under law. Skipski met her initial

---

1. Plaintiffs also allege that an incident occurred on July 17, 1990, but have provided no specifics about the incident nor produced any discernable documentary support.

burden of justifying immunity and plaintiffs have failed to meet their burden of showing facts to defeat qualified immunity on their claim. Thus, qualified immunity will be afforded Skipski. By the same reasoning, qualified immunity will be extended to any other state actors subject to plaintiffs' claims.

An amended complaint named two additional defendants, Mitchell Walker, the Cass County Probate Court Foster Care Licensing Agent, and Robin Zollar Smietanka, a counsellor with Assault Recovery Associates. Defendant Walker responded to the motion for reconsideration by asking this Court to affirm its decision and to extend qualified immunity to him. He also submitted a motion for summary judgment that makes the same request.

Walker's motion for summary judgment is GRANTED. The claim against him is dismissed on grounds of qualified immunity. In addition, plaintiffs' motion for reconsideration is DENIED. An Order consistent with this Opinion will be issued.