93 F.Supp.2d 1179 (2000)
T.M., a Minor, Through R.T. Cox, her Guardian Ad Litem; A.O., a Minor, through Cheryl Ranck Schwartz, her Guardian Ad Litem, Plaintiffs,
v.
Shirley R. CARSON, Director of the Wyoming Department of Family Services, in her individual capacity; Kathy Deiss, f/k/s Kathy Steiger, Regional Manager of the Wyoming Department of Family Services, in her individual capacity; Bonnie H. Volk, County Manager of the Wyoming Department of Family Services, in her individual capacity; Coleen A. Ferguson, an employee of the Wyoming Department of Family Services, in her individual capacity; Candy Driver, an employee of the Wyoming Department of Family Services, in her individual capacity; and Carolyn Howell, a former employee of the Wyoming Department of Family Services, in her individual capacity; John Does 1-5, current and/or former employees of the Wyoming Department of Family Services, in their individual capacities, Defendants.
No. 99-CV-1037-J.
United States District Court, D. Wyoming.
April 14, 2000.
*1180 Weston W. Reeves, Timothy W. Miller, Reeves & Miller Park Street Law Office, Casper, WY, for plaintiffs.
Patrick J Murphy, Susan Chapin Stubson, Williams Porter Day & Neville, Casper, WY, for Shirley R Carson, Bonnie H Volk, Coleen A Ferguson, Candy Driver, Carolyn Howell, defendants.

AMENDED ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ALAN B. JOHNSON, District Judge.
This case comes before the court on the defendants' motion for summary judgment. The case arises out of the terrible and tragic abuse endured by minors, T.M. and A.O., when they were placed in the foster care of Beth and Homer Griswold.
Homer Griswold was eventually convicted on twelve counts of sexual assault and taking indecent liberties with a minor.[1] *1181 The minors, through guardians ad litem, now bring this action against state employees, in their individual capacities, for violating the minors' Fourteenth Amendment substantive due process.

BACKGROUND
The following facts are either undisputed or must be treated as true in order to decide the defendants' motion for summary judgment. Dr. Beth Griswold is a professional psychologist in Gillette, Wyoming. She married Homer Griswold in 1978. They have no children. In 1984, Homer and Beth moved from Louisiana to Newcastle, Wyoming. Dr. Griswold was hired as the staff psychologist for the Northern Wyoming Medical Center. She was also a member of the Weston County Child Protection Team. Defendant Carolyn Howell was chairperson of the team.
On January 10, 1985, the Newcastle Police Department hired Mr. Griswold as a dispatcher. Within two months, five female employees complained in writing about his incessant sexual remarks, some sexual advances and his repeated use of the women's bathroom. Mr. Griswold was terminated for sexual harassment on March 18, 1985.[2]
The Griswolds became foster parents in Newcastle in 1986. L.F.[3] and M.F. were placed with the Griswolds by Carolyn Howell, a social worker with the Newcastle D-PASS office.[4] Ms. Howell did not do a home study on the Griswolds. Ms. Howell's husband was the Weston County Sheriff at the time Homer Griswold was hired by the Newcastle Police Department. Her husband's secretary, Peggy Livingston, was one of the complainants against Mr. Griswold.
Homer Griswold began having sex with L.F. and abusing her. L.F. told Carolyn Howell that Homer was having sex with her. A meeting of L.F., Mr. Griswold and Beth Griswold was conducted by Ms. Howell. Howell reported that L.F. stuck with her story for quite awhile that Homer had abused her. According to Howell, later in the evening L.F. recanted. After a child protection meeting the following day, the accusations were discussed by Beth Griswold, County Attorney Tracy Hunt, Rick Robb and Howell. It was decided for everyone's protection, as well as the agency, that L.F. would be transferred to another *1182 foster home. Shortly after, Ms. Howell had Dr. Griswold complete a psychological evaluation on L.F.
Plaintiffs claim that Carolyn Howell removed M.F. and L.F.'s social services file from the Newcastle D-PASS office. Defendants deny the allegation, and respond that when M.F. and L.F. moved to Rawlins in 1987, Carolyn Howell mailed the entire D-PASS social services file on the two children to the Rawlins D-PASS office. Defendants admit that the Griswolds' 1985 "foster parent file" that was created and maintained by the Newcastle D-PASS field office is missing and that none of the witnesses know what happened to the file. Candy Driver joined the Newcastle office as a social work supervisor in November, 1987. She never saw a Griswold foster parent file in the office. Foster parent files were supposed to be kept for at least three years. When Ms. Howell was interviewed at her home in 1997 by a Campbell County Sheriff's investigator and John Noteboom, Ms. Howell repeatedly went into a back room to retrieve notebooks and pieces of paper which she consulted in answering questions.
In 1987, the Griswolds moved to Gillette. Mr. Griswold was hired as a campus supervisor at Campbell County High School in August, 1989. Within a month, sexual abuse allegations were made against him by female employees and a female student. Mr. Griswold was removed from the workplace for the protection of the students. There is no evidence he subsequently worked as anything other than his wife's office manager.
Coleen Ferguson is a social worker for the Gillette DFS office. She is in charge of foster parent recruitment and training. In 1995, she recruited the Griswolds as prospective foster parents. The Griswolds filed a foster care application with defendant Coleen Ferguson on March 18, 1996. Ms. Ferguson placed T.M., a five year-old girl, in the custody of Homer and Beth Griswold in March, 1996, and placed a second girl, A.O., with the Griswolds on or about January 31, 1997. A.O. was six years old at the time.
There is substantial dispute between the parties over the procedure Coleen Ferguson and her supervisor, Bonnie Volk, used to place T.M. and A.O. in the care of the Griswolds. Plaintiffs claim that Ferguson transferred T.M. to the Griswolds without properly conducting a home study, without interviewing and training the Griswolds, without obtaining proper references, and without conducting an investigation into their background. Defendants dispute the plaintiffs' version of the procedure and steps taken by Ferguson and Volk, and dispute the inferences to be drawn from the facts. Examples of contested facts include the plaintiffs' allegation that Carolyn Howell deliberately removed the 1985 Griswold parent file from the Weston County D-PASS office. Defendants insist that Howell did not remove the file, and support their contention with Carolyn Howell's deposition testimony that she has no idea where the 1985 foster file is, but wouldn't be surprised if her secretary had destroyed it. (Defendants' Joint Memorandum in Support of their Motion for Summary Judgment at 32)[5] Defendants contend that Coleen Ferguson worked with the Griswolds from ten to fifteen hours and met with them up to six to ten times from December 1995 to March 1996. However, defendants note that in her deposition, when asked if she ever made appointments with the Griswolds to provide mandatory training, she responded, "I am going to say yes. I believe I did." When asked how many times, she answered, "I would imagine it would be the four, a minimum of four." When asked what the minimum of four is, she answered, "Job description. The working with the system. You know, the agency, *1183 as well as other agencies. The impact on the family and the impact on the child."[6]
Plaintiffs state that on the day the Griswolds filed a foster care application, Coleen Ferguson called Candy Driver at the Newcastle DFS office. Allegedly, Driver told Ferguson that it was her understanding the Griswolds were very cooperative and worked well with DFS. She told Ferguson that the Griswold's foster care file was missing, but made no investigation into its disappearance nor sought information about the Griswolds from any present or former DFS employee.
Plaintiffs allege that Dr. Griswold had told Ferguson that her husband had been accused of touching a foster daughter in Newcastle. Ferguson nonetheless stated in the written Foster Home Review that she would recommend the Griswolds as foster parents without hesitation. Plaintiffs also submitted an affidavit of Mickie Daigle, a licensed professional counselor, in which Daigle stated that, "I had two or more conversations with Coleen Ferguson about the Griswolds' extreme disciplinary methods and T.M.'s sexual abuse symptoms." It is unclear from the affidavit the exact nature of the conversations or when the conversations occurred.
Plaintiffs have submitted an affidavit from Dr. Kathleen Coulborn Faller, a professor in the School of Social Work at the University of Michigan which identifies several areas in which the placement of T.M. and A.O. was done, in her opinion, without the exercise of professional judgment. She concluded that no competent social worker who exercised professional judgment after conducting a home study in accordance with accepted practice and standards, as well as DFS's own requirements, would have certified Homer Griswold as a foster parent and placed children in his care in either 1987 or 1996; that the Griswold home study is so defective in so many areas, and violates so many requirements of DFS standards, as to indicate no professional judgment was exercised in its preparation or approval; that no competent supervisor exercising professional judgment would have certified the Griswolds as foster parents at any time, given the many critical deficiencies in the home study and other violations of DFS requirements; that Candy Driver substantially departed from accepted judgment and standards by telling Ms. Ferguson that "per her understanding the Griswalds [sic] were very cooperative and worked well with DFS" although she had not even known the Griswolds were foster parents in Newcastle; and that Carolyn Howell's response to the allegations of L.F. against Homer Griswold were such a substantial departure from accepted professional judgment and practice as to demonstrate that she actually did not base her response on such a judgment.
John Noteboom, a social service supervisor for Sheridan and Johnson counties testified in his deposition that in his opinion Ms. Ferguson acted in a reasonable and professional manner in doing her foster home study.

CONCLUSIONS OF LAW

A. Summary judgment standard
The standard for the grant or denial of summary judgment is well known:
Summary judgment is appropriate on a record demonstrating that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). As always, "we view the factual record and inferences therefrom in the light most favorable to the nonmoving party." Bullington, 186 F.3d at 1313.
Once the moving party meets its "initial burden to show that there is an absence of evidence to support the nonmoving *1184 party's case," Thomas v. IBM, 48 F.3d 478, 484 (10th Cir.1995) (quotation omitted), it is the nonmoving party's burden to "identify specific facts that show the existence of a genuine issue of material fact." Id. "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (quotation omitted).
Ransom v. Wagoner County Bd. of County Commissioners, No. 99-5087, 2000 WL 293716, at *2 (10th Cir.2000).

B. State's duty to protect from third party violence: special relationship doctrine
It is well settled that a state does not have a constitutional duty to protect its citizens from private violence. Sutton v. Utah State School for the Deaf and Blind, 173 F.3d 1226, 1237 (10th Cir.1999). In DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the United States Supreme Court held that generally, governmental agencies have no constitutional duty to protect a citizen from acts of violence committed by private individuals. The Tenth Circuit has recognized two exceptions to the general rule that the state is not constitutionally liable for violence committed by private individuals, the "special relationship" doctrine and the "danger creation" theory. The danger creation theory applies when the state has created the danger of attack or mistreatment by private individuals, or has rendered a person more vulnerable to such conduct. Currier v. Doran, 23 F.Supp.2d 1277, 1280 (D.N.M.1998), citing Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir.1995), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996).[7] The other exception to the DeShaney rule is the special relationship doctrine, which applies when the victim of the violence is somehow under the state's control, such as inmates of a prison or people involuntarily committed to a mental institution. This doctrine applies to children who are in the state's legal custody and have been placed in a foster home or institution. Yvonne L. By and Through Lewis v. New Mexico Dept. of Human Services, 959 F.2d 883, 893 (10th Cir.1992).
The special relationship doctrine was described in Armijo By and Through Chavez v. Wagon Mound Public Schools, 159 F.3d 1253, 1261 (10th Cir.1998) as follows:
A state is not required to provide its citizens with "particular protective services" under the Due Process Clause, and "failure to protect an individual against private violence simply does not constitute a violation of the Due Process *1185 Clause." DeShaney, 489 U.S. at 197, 109 S.Ct. 998. However, if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a "special relationship" during such restraint to protect that individual from violent acts inflicted by others.
In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf  through incarceration, institutionalization, or other similar restraint of personal liberty  which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
The Tenth Circuit Court of Appeals in Yvonne L. found that the right to protection applied to children who were placed in foster care. The court further found that the right to protection in foster care was clearly established in our circuit as of 1982:
The Supreme Court has not expressly decided the extent of due process rights to safety for children in foster care. The Court in DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 201, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989), held there is no affirmative duty of the state to protect a child who is in his parents' custody. In a footnote, the Court recognized that
[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeal have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

DeShaney, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9 (citing Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141-42 (2d Cir.1981), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), and Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 794-97 (11th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)). Plaintiffs point out that the Supreme Court has found a substantive due process interest in safe conditions, personal security, and bodily integrity for persons in state custody, and they assert that the right they seek to enforce in the instant case is already established, albeit in slightly different factual contexts, in those cases. City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (pretrial detainees); Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (mentally retarded); Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prisoners).
In Youngberg, the Supreme Court held that retarded persons committed to state institutions have a Fourteenth Amendment substantive due process right to "reasonable care and safety." 457 U.S. at 324, 102 S.Ct. at 2462. Thus, in 1982 it was established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1004-05. Youngberg arguably reaches the constitutional right plaintiffs assert to be clearly established.
Moreover, a right need not have been addressed by the Supreme Court to be established; such a rule "could have the practical effect of converting qualified immunity into absolute immunity." *1186 Benson v. Allphin, 786 F.2d 268, 275 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). Decisions from at least three circuits explicitly support plaintiffs' assertion of a clearly established right to reasonable safety while in foster care. The leading and earliest circuit-level case is Doe v. New York City Dep't of Social Servs., 649 F.2d 134 (2d Cir.1981), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). In Doe, the Second Circuit squarely held that a child in state custody has a constitutional right not to be placed in a foster care setting known to be unsafe. Id. at 141. Likewise, the Eleventh Circuit, in Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791 (11th Cir. 1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), relying upon Doe and Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), held "that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." Id. at 797 (applying the law to a 1982 incident).
Finally, the Seventh Circuit, in K.H. ex rel. Murphy v. Morgan, 914 F.2d 846 (7th Cir.1990), relying upon Youngberg and Doe, found a constitutional "right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child," id. at 853, was clearly established in 1986. In Morgan, the state placed a plaintiff in a series of foster homes and failed "to take steps to prevent the child from deteriorating physically or psychologically as a result of either mistreatment by one or more sets of foster parents or the frequency with which the child is moved about within the foster-home system or, as in this case both." Id. at 851. The court stated: "[i]t should have been obvious from the day Youngberg was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons...." Id. Thus, the right plaintiffs assert was clearly established at least in the Second Circuit by 1981, in the Seventh Circuit by 1986, and in the Eleventh Circuit by 1987. See also Jensen v. Conrad, 747 F.2d 185, 190-91 (4th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985) (discussing prison cases); Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1243 (2d Cir. 1984) (retarded children in state custody); Rubacha ex rel. Rubacha v. Coler, 607 F.Supp. 477, 479 (N.D.Ill.1985) (same). (footnote omitted)
Defendants attempt to distinguish these cases by an argument that "the state has more direct and immediate control over institutions it operates than over privately operated facilities with their own staffs and management policies." Appellees' Answer Brief at 27-28. They also point out that the Sixth Circuit has held that the right was not clearly established in 1982. Eugene D. ex rel. Olivia D. v. Karman, 889 F.2d 701 (6th Cir. 1989), cert. denied, 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990). But see id. at 711 (Merritt, C.J., dissenting). Defendants also assert the Seventh Circuit held, in 1989, that there was no clearly established right in 1984. Doe v. Bobbitt, 881 F.2d 510 (7th Cir .1989), cert. denied, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990). We note that a year later the Seventh Circuit in Morgan distinguished and limited Bobbitt. See Morgan, 914 F.2d at 852-53.
We believe a juvenile detention case in our circuit decided in 1982, Milonas v. Williams, 691 F.2d 931 (10th Cir.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983), supports a clearly established right to protection while in foster care. In Milonas, we held that juveniles involuntarily placed *1187 in a private school by state agencies or courts had liberty interests protected by the Due Process Clause of the Fourteenth Amendment; specifically, "[s]uch [a] person has the right to reasonably safe conditions of confinement." Id. at 942. The Supreme Court decision in Youngberg, our decision in Milonas, and the Second Circuit decision in Doe all were decided before August 1985. We are convinced that these cases clearly alerted persons in the positions of defendants that children in the custody of a state had a constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs.

C. Scope of constitutional duty to protect: professional judgment standard
In Yvonne L., 959 F.2d at 893-94, the Tenth Circuit also addressed the standard to apply in determining liability of state actors who place children in foster care where the children are abused. The court found that state officials will not be liable for harm to a foster child so long as they exercised "professional judgment." Yvonne L. clarified:
The standard to be applied, however, is a legal issue, which we determine here to give guidance to the district court on the remand. Defendants assert that deliberate indifference, as articulated by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), is the appropriate standard. In Estelle, the Supreme Court held that if prison officials display deliberate indifference to a prisoner's serious illness or injury, they violate the Eighth Amendment right against cruel and unusual punishment. The Second and Eleventh Circuits appear to have adopted this standard in cases involving the constitutional right of children in state custody to reasonable safety while in foster care environment. See Taylor, 818 F.2d at 795-97; Doe, 649 F.2d at 141-45.
Plaintiffs argue that the Eight [sic] Amendment standard is inappropriate, and urge that we adopt the standard that the Supreme Court applied in Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. The Youngberg Court held that a mentally retarded person committed to a state institution had a Fourteenth Amendment right to reasonable protection from physical harm. Id. at 315-16, 102 S.Ct. at 2457-58. The standard set out in Youngberg was that state officials would be shielded from liability unless the defendants showed that they failed to exercise professional judgment. This standard has been adopted by the Seventh Circuit. See Morgan, 914 F.2d at 854 ("Only if without justification based either on financial constraints or on considerations of professional judgment [state welfare workers and their supervisors] place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages."). As applied to a foster care setting we doubt there is much difference in the two standards. "Failure to exercise professional judgment" does not mean mere negligence as we understand Youngberg; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements. To the extent there is a difference in the standards, we agree with the Seventh Circuit that the Youngberg standard applies. The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are "entitled to more considerate treatment and conditions" than criminals. Youngberg, 457 U.S. at 321-22, 102 S.Ct. at 2461-62. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves. *1188 The officials who place the children are acting in place of the parents.
Defendants contend that summary judgment should be granted in their favor as they never "knew or suspected" that Homer or Beth Griswold were dangerous to children. (Defendants' Joint Memorandum in Support of their Motion for Summary Judgment at 68) They further contend that the reference in Yvonne L. to "abdication of the duty to act professionally in making the placements" means that in order to impose section 1983 liability, social workers must be more than "negligent" in making that placement, and more than "grossly negligent." The social workers must totally and completely abandon any effort to act professionally in making those foster care placements. The defendants base their position on the statement in Yvonne L. that the court perceives a minuscule difference between the deliberate indifference and the professional judgment standards in the foster care setting. (Id. at 70-71) Finally, defendants suggest that the Tenth Circuit now requires plaintiff foster children to demonstrate that the totality of each of the defendant's conduct must "shock the conscience" to survive summary judgment. (Id. at 71)
Defendants' argument is not unfounded. It has been observed that the Yvonne L. decision created confusion when it indicated that there was not much difference between "deliberate indifference" and "professional judgment." In a 1996 law review article, the author observed:
[T]he ambiguity of the professional judgment and deliberate indifference standards is perhaps best encapsulated by the Tenth Circuit's decision in Yvonne L. v. New Mexico Department of Human Services. Although one of the few courts to note and survey the split between professional judgment and deliberate indifference jurisdictions before choosing between them, eight years after Youngberg v. Romeo the court could truthfully remark that "(a)s applied to a foster care setting we doubt there is much difference between the two standards."
It may therefore be doubted whether there is today any difference between professional judgment and deliberate indifference, or whether states care for foster children any better than they might care for prisoners. This blurring of what should be two distinct standards is troubling because the Supreme Court insisted in Estelle that the deliberate indifference standard was to provide more protection to state actors (and therefore less to foster children) than would a professional judgment standard. The Court reiterated this design in Youngberg. The problem seems to be partly that the Supreme Court's opinions have been opaque, and partly that the two standards it has promulgated have not been helpful on a practical level in resolving cases.
The fact that a foster child can vindicate the right to safe custody only through Section 1983 has further confused the matter. Any claim brought under Section 1983 must aver that the state acted with some culpability above gross negligence. Yet the Tenth Circuit has held that gross negligence without more suffices to create liability under the professional judgment standard. In the Tenth Circuit, therefore, state neglect of foster children resulting from gross negligence violates the child's civil rights, but those same civil rights cannot be vindicated under Section 1983 because the violation is the result of mere gross negligence, and nothing worse.
Brendan P. Kearse, Abused Again: Competing Constitutional Standards for the State's Duty to Protect Foster Children, 29 COLUM. J.L. & SOC. PROBS. 385, 403 (1996) (footnotes omitted).
Although the Tenth Circuit's distinction between "professional judgment" and "deliberate indifference" may have resulted in ambiguity, a review of the case law discussing both standards indicates that the difficulty in applying the "professional *1189 judgment" standard does not lie with Yvonne L., but in reconciling the United States Supreme Court's 1982 "professional judgment" standard in Youngberg with its later pronouncement in Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) that a section 1983 plaintiff must show more than mere negligence to state a due process violation. Daniels and Youngberg however can be reconciled, and their reconciliation does not require the court to disregard the professional judgment standard. The Third Circuit Court of Appeals compared Youngberg and Daniels in Shaw By Strain v. Strackhouse, 920 F.2d 1135, 1146-47 (3rd Cir.1990) and arrived at the following resolution:
Defendants' second argument is that even if Youngberg did apply the professional judgment standard to independent claims alleging a failure to provide adequate protection, this holding has been eviscerated by the Court's later decisions in Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), and Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Defendants reach this conclusion by constructing a syllogism. Defendants assert, first, that Davidson and Daniels held that liability under the due process clause of the fourteenth amendment cannot arise "where a government official is merely negligent in causing [a plaintiff's] injury." Davidson, 474 U.S. at 346, 106 S.Ct. at 669. Defendants argue, second, that when applied to a failure to protect claim, the professional judgment standard of Youngberg is the functional equivalent of a negligence standard. The logical conclusion of this two-step reasoning, defendants contend, is that Davidson and Daniels have implicitly overruled Youngberg, at least as regards failure to protect claims.
This syllogism is facially plausible, but ultimately erroneous. Defendants' reading of Davidson and Daniels is unimpeachable. Mere negligence cannot trigger due process protection. We think, however, that defendants' attempt to equate professional judgment and negligence falls short of the mark. Professional judgment is a relatively deferential standard. It requires only that a state actor exercise professional judgment in choosing the appropriate course of action. Negligence, however, imposes on a state official the burden of choosing, from among alternatives, a course of action consistent with the exercise of "due care." That means, as we see it, rejecting negligent alternatives that might nonetheless satisfy the demands of professional judgment.
Admittedly, the two standards are premised on different criteria. Thus, any attempt to place the two on a single continuum risks becoming, in the vernacular, a comparison of "apples and oranges." This dissimilarity notwithstanding, professional judgment appears to us to be a substantially less onerous standard than negligence from the viewpoint of the public actor. Indeed, in our view, professional judgment more closely approximates  although, as we have discussed, remains somewhat less deferential than  a recklessness or gross negligence standard. Professional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct.
This taxonomy is, we think, fatal to defendants' argument. The Daniels Court clearly held that simple negligence is insufficient to trigger due process protection. The Court explicitly refused, however, to extend its holding to preclude due process protection based on interim standards such as recklessness, gross negligence, and (by our analysis) professional judgment. See Daniels, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3. Hence, contrary to defendants' assertions, the professional judgment standard of Youngberg is not implicitly overruled by Davidson and Daniels. Courts of Appeals have no business overruling *1190 Supreme Court decisions. Until the Court acts more definitively, Youngberg remains good law. [FN4]
FN4. We are in no position, of course, to predict the future path of Supreme Court jurisprudence. If recent holdings are any indication of the Court's sentiment, however, Youngberg is in no immediate danger. We note, in particular, Chief Justice Rehnquist's majority opinion in DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which contains an extensive discussion of the continuing viability of Youngberg and the affirmative obligation it imposes on state officials, under the due process clause, "to provide involuntarily committed mental patients with such services as are necessary to ensure their `reasonable safety' from themselves and others." Id. at 1005.
Shaw, 920 F.2d at 1146-47.
The defendants contentions are similar to those proffered in Shaw. In fact the defendants reply brief goes so far as to submit that, "Since the Yvonne L. decision, the Tenth, Seventh and Third Circuits have raised the liability standard for "professional judgment" to "deliberate indifference" and/or "reckless disregard." " (Defendants' Reply Brief in support of their Motion for Summary Judgment at 3) Defendants go on to argue that not a single Tenth Circuit case has applied the professional judgment standard since the 1992 ruling in Yvonne L., even though it had multiple opportunities to apply the standard in factually similar cases, such as Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995) and Armijo v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir.1998).
The court finds the defendants' analogy of cases involving an affirmative duty arising out of state imposed custody, to cases such as Uhlrig and Armijo, to be an inaccurate comparison. None of the cases cited by defendants involve the "special relationship" giving rise to an affirmative duty of the state to protect an individual.[8] The court is also unpersuaded by defendants' suggestion that they should incur no liability to an abused foster child so long as they don't know or suspect that the child is being molested. As demonstrated in Wendy H. v. City of Philadelphia, 849 F.Supp. 367, 371-72 (E.D.Pa. 1994), such a position would encourage an "ostrich" approach to placement of foster children, where a victimized foster child could be left at the mercy of abusers, just as long as the state official never "knew or suspected" that the child was being abused. The district court in Wendy H. elaborated on the imprudence of this position:
In Youngberg v. Romeo, the Supreme Court's choice of the arguably more strict "professional judgment" standard for the state's care in mental institutions, rather than the more permissive "deliberate indifference" standard was grounded in the recognition that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321-22, 102 S.Ct. at 2461-62. As others, including a member of my own court, have recognized, this consideration *1191 is equally prevailing in the assignment of children to foster homes. Cf. Yvonne L., 959 F.2d at 894; Baby Neal, 821 F.Supp. at 340 (professional judgment standard is correct because "similar[ly] to institutionalized mental patients, [foster] children have been placed in the custody of the state through no fault of their own"); LaShawn A. v. Dixon, 762 F.Supp. 959, 996 (D.D.C. 1991), aff'd 990 F.2d 1319 (D.C.Cir.1993). I find that the "professional judgment" standard is appropriate for evaluating defendant Finney's conduct.
If "deliberate indifference" is equated with recklessness or gross negligence, Doe, 649 F.2d at 143, and failing the "professional judgment" standard demands more misconduct than simple negligence, Youngberg, 457 U.S. at 321-22, 102 S.Ct. at 2461-62, then at first blush it seems we dance on the head of a pin in applying the professional judgment standard. Cf. Shaw, 920 F.2d at 1146. But the "professional judgment" standard represents more than just a difference in degree of malfeasance, but in kind.
In Youngberg, in which the professional judgment standard was first employed by the United States Supreme Court, the Court established that a decision
if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. The Court designated professional standards as the baseline from which defendants' conduct should be measured, rather than the conduct of a "reasonable man" which grounds determinations of negligence, gross negligence, and recklessness. By transforming the relevant comparison, the Court implicitly enhanced the importance of expert testimony; indeed, in all but the most clear cut circumstances such testimony on the exercise of professional judgment is probably necessary. Cf. Youngberg, 457 U.S. at 323, n. 31, 102 S.Ct. at 2462, n. 31; Society for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1089-90 (2d Cir.1990). Furthermore, the professional judgment standard is more exacting than just professional malpractice; liability should attach only when the defendant failed to meet "professionally accepted minimum standards." Society for Good Will, 902 F.2d at 1090 ("Expert reports and testimony should be used only to establish the general parameters of acceptable, constitutional activity, and not whether the exercised professional judgment was indisputably correct and unassailableor for that matter even a better approach to the problem.")
Defendant Finney's principal assertion behind her motion for summary judgment is that under either the "deliberate indifference" or "professional judgment" standards she must have done more than neglect duties; she must have either "known or suspected" that the conditions in the foster home were dangerous. Defendants Motion for Summary Judgment at 30. The implicit contention of this argument is that liability could have attached only if she had failed to act after being made aware by the plaintiff or Bogans of the sexual abuse occurring in the Mitchell home. I find that this assertion misstates the professional judgment standard, and the obligation Finney had to the plaintiff even after the primary social work role was delegated to the WCA and Bogans. (emphasis added)
First, I must note that Finney mischaracterizes her own conduct when she contends that she was not at all on notice to the risk to the plaintiff; the case summary which she did read informed her *1192 that the plaintiff had previously been a victim of sexual abuse. However, because the allegation that Finney failed to exercise professional judgment is supported by evidence that includes numerous instances where Finney's neglect of her duties blinded her to the risks the plaintiff faced, I will address her contention that such misconduct cannot be held against her.
While the Supreme Court did not fully delineate the professional judgment standard in its Youngberg decision, it acknowledged that it was adopting the framework employed by then Chief Judge Seitz in his opinion concurring in the en banc Third Circuit panel's holding in the same case. Youngberg, 457 U.S. at 321-22, 102 S.Ct. at 2461-62 (citing to Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J. concurring)).
Judge Seitz's concurrence differentiated what he believed to be the correct standard for a constitutional tort from the majority's insufficiently deferential "reasonableness" or "malpractice" standard. Id. at 177-78. Instead he insisted, and the Supreme Court subsequently agreed, that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 178.
To fulfill this requirement in the context of an institution, Judge Seitz stated and reiterated that the defendants "have an affirmative obligation to discover the needs of ... patients, and to respond to those needs in an adequate manner." Id. at 177, 178 (emphasis added). This delineation of the professional judgment standard suggests that defendants evaluated under it are constitutionally required not just to respond to danger to safety which they have been put on notice to, but to act in a manner which avails them of that notice. Cf. Susan Stefan, Leaving Civil Rights to the "Experts": From Deference to Abdication Under the Professional Judgment Standard, 102 YALE L.J. 639, 707-08 (1992). (emphasis added)
Courts analyzing constitutional claims in the foster child context have found violations by defendants for harm caused by their neglect, absent actual knowledge of the risk. See e.g. LaShawn A. v. Dixon, 762 F.Supp. 959, 993, 996, 997-98 (D.D.C.1991) ("To the extent that certain services, such as appropriate placements and case planning, are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services.")
The Second Circuit found such neglect actionable even under the less rigorous deliberate indifference standard. See Doe, 649 F.2d at 142, 143 ("repeated acts of negligence could be evidence of indifference") ("the fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference.") The Second Circuit distinguished the key question as being "whether the state of mind was such that the agency may be `meaningfully' termed, `culpable'." Id. at 144. The Court insisted that while deliberate indifference
cannot exist absent some knowledge triggering an affirmative duty to act on plaintiff's behalf, ... actual knowledge of a specific harm is not the only type of knowledge that will suffice. Defendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's *1193 deprivation of rights under the Constitution.

Id. at 145 (emphasis added); see also id. at 145 (the above analysis should not be looked upon as imposing strict liability, "but as inferring deliberate unconcern for plaintiffs' welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse.").
Defendant Finney cites in opposition to this understanding Shaw v. Strackhouse, 920 F.2d 1135 (3d Cir.1990), in which a retarded resident of a mental institution brought a § 1983 action for two incidents of sexual abuse. The Circuit Court found several of the named defendants liable for the second incident when they were on notice of the threat to the plaintiff, but not for the first event. Id. at 1144, 1149.
While this holding does not stand in contradiction to the defendant's contention that failure to exercise professional judgment can occur only when a defendant is on actual notice to harm or risk of harm, it also does not confirm it. Defendant Finney cites Shaw for the quoted statement that to be liable professionals "knew or suspected" dangerous conditions, but neither that phrase nor one similar to it appears in the text of that decision. In fact, in addressing the initial event of sexual abuse, the Court points out that in regards to the suspected abuser "[w]e find nothing in the record indicating that defendants either knew or should have known of the risk posed by [him.]" Id. at 1144 (emphasis added). Accordingly, any failures in the level of supervision of the plaintiff constituted no more than simple negligence. Id. at 1143. However, the court was not faced with evidence that the defendants would have known of a risk to the plaintiff had they not neglected an important duty. Id.

While the Third Circuit has not directly dealt with the issue in the foster care setting, I am persuaded by the holdings of the LaShawn A. and Doe courts that plaintiffs in making out a claim of constitutional violation can employ evidence of misconduct which is not predicated on actual knowledge of harm or risk. To do otherwise would be to endorse neglect by government officials in the care of institutionalized and foster children. Indeed, to allow officials entrusted with these responsibilities to neglect their duties with impunity would stand the professional judgment standard on its head by placing the officials in a better position if they could claim "I didn't read the report" or "I didn't return phone calls", than if they explained that "I read the report and kept in contact with my charges, and I made this decision because ...". [FN2] (emphasis added)
FN2. My interpretation of the Youngberg professional judgment standard is in opposition to the majority's holding, and in accord with Judge Coffey's dissent, in the 7th Circuit's application of the standard to foster care circumstances in K.H. Through Murphy v. Morgan, 914 F.2d 846 (1990). The majority, confronted with the circumstance of a child who had been abused by foster parents, limited liability under the professional judgment standard to officials who handed the children over to a foster parent "whom the state knows or suspects to be a child abuser." Id. at 852 (emphasis in the original). Judge Coffey asserted in dissent that by this statement "[t]he majority strains the law and intentionally limits the scope of protection to which a child in state custody is entitled." Id. at 861. He cited Youngberg and Doe [v. New York City Dept. of Social Services], 709 F.2d 782 (2d Cir. 1983), for the proposition that a pattern of neglect of obligations could occasion liability. Id. His admonishment that "[i]t is not too much to ask that the state honor its obligation to monitor the current status and needs of the children *1194 dependent upon its care mandated within the parameters of its own regulations," id. (emphasis in original), is equally powerful in the case before me. I find Judge Coffey's analysis and the weight of circuit authority to be in accord with my interpretation of Youngberg's mandate, and therefore I do not find the holding in K.H. to be persuasive authority.
Such failure to exercise professional judgment is particularly egregious in the case of children, for whom the state has taken responsibility in the stead of the caretakers in which our society has traditionally vested its greatest trust  the children's families. The fact that the state has delegated much of the plaintiff's care and supervision to two layers of private actorsthe foster family, and the social work agency  makes the duties the state has maintained even more vital. If we fail to insist that the state appropriately supervise and monitor placements, children like Wendy H. may lose an opportunity to extricate themselves from victimization, and are left to suffer harms which may never be undone.
Furthermore, allowing evidence of misconduct by officials which did not give them actual knowledge of harm or risk, but instead allowed them to avoid such knowledge, to impact on liability does not place officials at excessive risk of liability. Constitutional liability will not attach for every error in judgment nor for every mishap which occurs on the defendants [sic] watch, but only when the professional's misconduct was a "substantial departure" from acceptable practice. Youngberg, 644 F.2d at 178. Liability is further cabined by the plaintiff's obligation to show that the neglect of duty proximately caused the liberty violation. Doe, 649 F.2d at 145. Additionally, as the Second Circuit observed "[t]here is a closer and firmer line of authority running from superiors and subordinates within an institution than exists in the foster care context ... [which] suggest[s] that [a constitutional violation] ought not be inferred from a failure to act as readily as might be done in the prison context." Id. at 142. Accordingly, in requiring "professional judgment" of defendant Finney, I do not expect constant supervision, but rather responsible placement in, and oversight of, the foster home.
Wendy H., 849 F.Supp. at 372-75.
Examining the factual record and the reasonable inferences drawn therefrom in a light most favorable to the plaintiffs, the court finds that summary judgment as to defendants Volk, Ferguson, Driver and Howell is inappropriate in this case as genuine issues of material fact exist as to whether these defendants exercised professional judgment. Barzellone v. Tulsa, No. 99-5088, 2000 WL 339213 (10th Cir. 2000). If proven, the facts alleged by the plaintiffs could lead a reasonable jury to find that the defendants Volk, Ferguson, Driver and Howell failed to exercise professional judgment.
The court finds that summary judgment should also be denied as to defendants Carson and Deiss. Defendants argue that summary judgment should be granted in their favor because plaintiffs have failed to allege any facts showing personal involvement on behalf of Carson or Deiss in the alleged deprivation of constitutional rights. Defendants' argument appears to be that the claims should be dismissed for failure to state a claim for relief, rather than on the basis that there is no genuine issue of material fact and they are entitled to judgment as a matter of law.[9]
Plaintiffs allege that Carson and Deiss acquiesced in a custom of employing foster parents without investigating their backgrounds or adhering to DFS rules, and that they failed to train, supervise, or correct *1195 Volk, Ferguson and Driver. Plaintiffs, however, provide little factual support for their claims, other than a Legislative Service Office report that DFS has not implemented safeguards to assure adequate supervision of its caseworkers through policy, training or quality assurance reviews. Plaintiffs contend that they are not able to provide more of a factual basis at this time because defendants have failed to produce requested discovery, and final discovery cutoff is April 7, 2000. The court finds that plaintiffs' claims should not be dismissed at this time, although the claims will be subject to dismissal in the event that plaintiffs are unable to show facts to support their allegations against defendants Carson and Deiss.[10]See Suton v. Utah School for the Deaf and Blind, 173 F.3d 1226, 1236 (10th Cir.1999) (the sanction of dismissal should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief).
NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' Motion for Summary Judgment is DENIED.
NOTES
[1] On April 16, 1998, Griswold was charged with ten counts of second degree sexual assault, in violation of Wyo. Stat. Ann. §§ 6-2-303(a)(v), 6-2-306, and 6-10-102, and two counts of taking indecent liberties with a child, in violation of § 14-3-105. Counts I through V alleged sexual assault of AO by fellatio, penile intrusion of the anus, cunnilingus, digital intrusion of the vaginal area, and penile intrusion of the vaginal area. Count VI alleged indecent liberties with AO. The dates for these charges were January 31 through December 2, 1997. Counts VII through XII mirrored those allegations with respect to TM, and alleged dates of March 23, 1996, through November 21, 1997. Griswold was ultimately bound over on all charges, and a jury found him guilty on all twelve counts. The district court sentenced him to five concurrent terms of life imprisonment to run consecutively with another five concurrent terms of life imprisonment for the ten counts of sexual assault. In addition, he was sentenced to two nine to ten-year terms of imprisonment for the two indecent liberties counts to run consecutively with the other terms. Griswold v. State, 994 P.2d 920, 924 (Wyo.1999).
[2] The plaintiffs also allege that Mr. Griswold was abused by his father, and disclosed the abuse to Coleen Ferguson. He allegedly molested two of his sisters. In his 1985 Newcastle police department application, Mr. Griswold disclosed that he had used marijuana many times in the late 60's and early 70's, and had used heroin many times while in Vietnam. During part of 1981 and 1982, two of Mr. Griswold's nieces, B.K. and A.N., lived with the Griswolds in Louisiana. Mr. Griswold had sexual intercourse with B.K., an eleven year-old about every other day. He also performed sexual acts with A.N., an eight-year old. In 1985, Mr. Griswold's brother was convicted in Arkansas on three counts of raping B.K., A.N., and a step-daughter.
[3] The court will refer to the minors who were subject to abuse by using their initials.
[4] Defendants explain that the Department of Family Services (DFS) was created by statute in 1991 and the predecessor agency to DFS was the Department of Public Assistance and Social Services (D-PASS).
[5] Clearly, this is a genuine issue of material fact which should be left for a jury to determine.
[6] Her deposition responses do not resolve the material issue of how many times she actually met with the Griswolds, and whether exercising professional judgment would require her to conduct any further investigation into their ability to provide adequate foster care.
[7] In Currier, the plaintiffs alleged that a three-year old child's right to substantive due process was violated by removing him from his mother's custody and allowing his father to obtain custody. The child was subsequently killed by his father. The court found that the special relationship doctrine did not apply because the child was not in state custody. It held that the danger creation theory might apply:

The other possible exception to the DeShaney rule, the danger-creation theory, applies when the state has created the danger of attack or mistreatment by private individuals, or has rendered a person more vulnerable to such conduct. Uhlrig, 64 F.3d at 572. This theory might apply to the present case based on the involvement of the state in awarding custody. Anthony was in his mother's physical and legal custody when the state removed him from that position, took responsibility for his safety and well-being, and deposited him with his father, who had never had custody or control over Anthony and who ultimately killed him. If the state's conduct, given the information it had, was egregious enough to shock one's conscience, a viable substantive-due-process claim might be present.
Currier, 23 F.Supp.2d at 1281-82. In Uhlrig, a therapist was killed by a mental hospital patient. In a section 1983 action, the executor of the therapist's estate relied on the danger creation theory to meet the state action requirement. The Tenth Circuit agreed with the district court that plaintiff failed to raise a genuine dispute of fact that the defendants 1) recklessly created the danger that led to Uhlrig's death, or 2) acted in a "conscience shocking" manner.
[8] The defendants' reliance on the following cases is misplaced: Martinez v. Mafchir, 35 F.3d 1486 (10th Cir.1994) (involved a challenge to "familial integrity" when physical custody was never lost); Uhlrig v. Harder, 64 F.3d 567 (10th Cir.1995) (creation of danger theory); J.B. v. Washington County, 127 F.3d 919 (10th Cir.1997) (alleged due process violation of right to associate with family); Currier v. Doran, 23 F.Supp.2d 1277 (D.N.M.1998) (special relationship theory didn't apply); Armijo v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir.1998) (danger creation theory); A.S. v. Tellus, 22 F.Supp.2d 1217 (D.Kan.1998) (legal custody without physical custody insufficient to create special relationship); Sapp v. Cunningham, 847 F.Supp. 893 (D.Wyo.1994) (no custodial relationship); Sutton v. Utah State School for the Deaf and Blind, 173 F.3d 1226 (10th Cir.1999) (plaintiff abandoned special relationship theory and relied only on danger creation theory).
[9] Defendants do not provide the court with any depositions or affidavits to refute plaintiffs' allegations against Carson and Deiss.
[10] Defendants and plaintiffs suggest that the standard to be applied in determining whether Carson and Deiss violated plaintiffs' constitutional rights is one of deliberate indifference. They cite Sutton v. Utah State School for the Deaf and Blind, 173 F.3d 1226, 1239-41 (10th Cir.1999) and Black by Black v. Indiana Area School Dist., 985 F.2d 707, 713 (3rd Cir.1993) for the proposition that supervisory liability requires a showing of deliberate indifference. Both those cases, however, deal with a "created danger" rather than a "special relationship." In Wadkins v. Gulf Coast Centers, Ltd., 77 F.Supp.2d 794, 798 (S.D.Tex.1999), the court employed the professional judgment test in determining whether official policies of the defendant created conditions that allowed the sexual abuse to occur. In Shaw v. Strackhouse, 920 F.2d 1135, 1146 (3rd Cir.1990), the court agreed that liability under section 1983 cannot be imposed vicariously or under traditional grounds of respondeat superior, but may only be imposed on those defendants who had the power and the responsibility to protect the plaintiff. The court determined that the Youngberg professional judgment standard should be applied to the "professional decisionmakers," including the primary care professionals, supervisors, and administrators who had the authority or the responsibility to see that the plaintiff received protection. It appears that the correct standard to apply to Carson and Deiss is the professional judgment standard. However, since it is not necessary to a determination of defendants' motion for summary judgment to decide what standard applies to Carson and Deiss, the parties are invited to provide the court with case law addressing the standard to be applied to supervisors where the state owes the plaintiff an affirmative duty to protect because of the existence of a special relationship, and the standard applied to non-supervisors is "professional judgment."